PEOPLE *v.* DUNN.

1. HOMICIDE—EVIDENCE—QUESTION FOR JURY.

Where, in a prosecution for murder, the defense of self-
defense was based largely on defendant's self-serving state-
ments made at the time of his arrest, and there was
abundant evidence, both direct and circumstantial, to carry
the case to the jury, the trial court was not in error in
refusing to direct a verdict for defendant.[1]

2. SAME—VERDICT NOT AGAINST OVERWHELMING WEIGHT OF EVI-
DENCE.

The verdict of murder in the second degree, *held*, not
against the overwhelming weight of the evidence.[2]

3. SAME — SELF-DEFENSE—EVIDENCE—DECEASED'S REPUTATION AS
A BAD MAN MAY BE SHOWN.

In a prosecution for murder, where the defense was self-
defense, the defendant had a right to show that deceased's
reputation and character were bad, that he was known as
a gunman and had made threats against defendant and
others, and that defendant knew it.[3]

4. CRIMINAL LAW—EVIDENCE—CHARACTER OF DEFENDANT NOT IN
ISSUE UNLESS DOOR OPENED BY DEFENSE.

In a criminal case the prosecution may not go into the
question of defendant's character, except as the defense
opens the door for it.[4]

5. SAME—REFUSAL TO STRIKE ALIASES FROM INFORMATION JUSTI-
FIED BY RECORD—DEROGATORY NAMES.

Where the testimony for the defense as well as for the
prosecution tended to show that there was uncertainty
as to the real name of the defendant, the trial court was
not in error in refusing to strike from the information
all names by which it alleged defendant was known other
than that of what is claimed to be his real name; the
rule that the unwarranted use of derogatory names may
be prejudicial not being applicable in the instant case.[5]

[1]Homicide, 30 C. J. § 570; [2]Id., 30 C. J. § 560; [3]Id., 30 C. J.
§§ 465, 474; [4]Criminal Law, 16 C. J. § 1122; [5]Indictment and In-
formation, 31 C. J. § 230 (Anno).

Proof of self-defense necessary to warrant admission in evi-
dence as to character and reputation of deceased, see note in
3 L. R. A. (N. S.) 355.

6. Homicide—Malice—Instructions Not Misleading.

    In a prosecution for murder, an instruction that express malice "meant an actual intention to kill," while inapt and lacking in technical accuracy, *held*, not misleading to the jury, when considered in connection with what was further said upon the subject and upon the law of self-defense, which was favorable to defendant.[6]

7. Criminal Law—Trial—Instruction as to Reasonable Doubt Not Prejudicial.

    An instruction that it was the duty of the jury to acquit defendant in case the proofs left their minds "equally or exactly balanced," because the prosecution would then have failed to establish defendant's guilt beyond a reasonable doubt, *held*, not open to the objection that this instruction left the jury under the impression that it was defendant's duty "to balance the testimony offered by the State before the jury has a reasonable doubt" of his guilt, since the context shows to the contrary.[7]

8. Same—Requested Instruction Substantially Covered Properly Refused.

    Where the instruction of the court on the law of self-defense substantially covered the thought contained in a requested instruction on said subject, there was no error in its refusal.[8]

Error to recorder's court of Detroit; Stein (Christopher H.), J. Submitted October 15, 1925. (Docket No. 139.) Decided December 22, 1925.

John Dunn, *alias* Paul Foley, *alias* Pudgy Dunn, was convicted of murder in the second degree, and sentenced to imprisonment for not less than 15 nor more than 30 years in the State prison at Jackson. Affirmed.

*Chawke & Sloan,* for appellant.

*Andrew B. Dougherty,* Attorney General, *Robert M. Toms,* Prosecuting Attorney, and *Edward H. Kennedy,* Assistant Prosecuting Attorney, for the people.

---

[6]Criminal Law, 16 C. J. § 2493; Homicide, 30 C. J. § 608; [7]Criminal Law, 16 C. J. §§ 2398, 2493; [8]Id., 16 C. J. § 2506; Homicide, 30 C. J. § 618.

STEERE, J.    Defendant was convicted by the verdict of a jury, on January 23, 1925, of murder in the second degree under an information filed against him charging that "said defendant on the 25th day of January in A. D. 1924, at the city of Detroit, in the county aforesaid, feloniously, wilfully and of his malice aforethought, did kill and murder one William Riley, *alias* George Kelly, contrary to the form of the statute in such cases made and provided," etc., and sentenced to confinement in the State prison at Jackson, Michigan, for the term of from 15 to 30 years, without recommendation.

In outline the testimony introduced shows that a patrolman named Shuler of the Detroit police force was patrolling his beat between 4 and 4:30 in the morning of January 25, 1924, and on arriving at the corner of John R. and Montcalm streets in said city halted temporarily at that corner and looked south along John R. street which runs in a northerly and southerly direction.    While so looking he heard a shot and saw what he called a gray smoke coming from underneath the porch of a house at premises described as 2325 John R. street.    He then started down the street in that direction with his revolver in his hand, not going very fast as he said because he couldn't see anybody, and just before reaching the house he heard the front door slam.    He went upon the porch and attempted to push or kick in the door but could not move it.    He then noticed a pool of blood on the porch floor a little larger than a dinner plate and a hat near it.    He then jumped over the porch rail into an alley at the side of the house and looked for footprints in the snow which had recently fallen but saw none and as he hurried out of the alley he met an automobile which drove up with three detectives of the police force in it, named O'Day, Frazier and Swords.    They had been out on some other mission but happened to stop

near by there to allow one of their number to leave the car and hearing the shot drove up to investigate. Learning the situation so far as related and pointed out by Shuler, they immediately surrounded the house while Shuler went down and pulled "the box for a flier." Frazier covered the corner of Montcalm and John R. street and O'Day stationed himself in the alley in the rear of the house while Swords went round to the front door and knocked, at first getting no response, but on his knocking louder a woman answered from within. He told her he was an officer and demanded that she open the door. She then screamed and when again asked by the officer to open the door said that she could not do so. The flier from the station had then arrived and Swords with the assistance of an officer who came in it broke open the door. It had three or four locks upon the inside which were so strong that the whole door jamb had to be pushed in to obtain entrance. Upon entering they found the body of a man known as William Riley, *alias* George Kelly, lying on his back with a bullet wound in his neck, his head being toward the west, with his feet close against the door and his body in line with it. He was yet bleeding from a hole through his neck and there was a quantity of blood on the floor where he lay. The physician who examined the body testified that death was caused by a hemorrhage from a gunshot wound through the neck, the point of entrance being one inch below the angle of the jaw on the left side, the bullet passing through the neck and lodging immediately under the skin three inches below and three inches back of the temporal bone on the right side.

After Detective O'Day had taken his position in the alley at the rear of the house and the officers at the front were trying to get in he heard a noise which sounded to him as if some one was coming out through a window at the rear of the house, but could see no

one.    When the flier which had been sent for arrived he called for them to throw the light of their auto over the back yard, which they did.    He then saw defendant who had hid under a porch, or the lower steps of an outside stairway leading to the second floor at the rear of the house.    As the light struck defendant he came out with his hands raised, calling "Don't shoot," going towards O'Day who arrested and handcuffed him.    He was then without hat or coat. O'Day said it was about three minutes after he heard the window open and the flier come up that they discovered defendant with the flashlight.    A police lieutenant named Schould who came up with the flier describes the arrest as follows:

"We met Detective O'Day in the alley; he says 'I think he is in the back yard in that place.    I heard somebody coming out of the window.'    We threw the light in and Dunn walked up.    I grabbed his arm and pulled a gun out of his hand.    O'Day handcuffed him and took him out of (to) the car.    Dunn said, 'Boys, give me a square deal, you can get him inside of the door right there on the floor.'    *    *    *    I heard him say 'I guess he was after me and he was trying to get me,' and 'I beat him to it,' and I heard similar remarks that he tried to get Dunn."

Several of the officers were sufficiently near to witness part or all of the arrest and what was said and done until defendant was taken away to the station, and told of what he said during that time in urging his claim of self-defense.    O'Day testified:

"After I put the handcuffs on him I took him to the Ford car and stayed there with him.    He says, 'Give me a square deal—the other fellow is probably worse than I am.'    (Cross-examination.)    I asked him if he was the man killed this man and he said yes.    He did not tell me that he was after him. The conversation with Mr. Dunn was while we walked from the rear of the house around to the front.    Mr. Dunn says:    'The other fellow is probably worse than I am.'    'I shot him because he was trying to get into

my home.' 'You go in there in the house and you will find a .45 automatic gun in his pocket in his overcoat.' I did not hear him say, 'When I opened the door he stuck his gun up on me,' or words to that effect, or 'And I beat him to it.' "

Detective Swords testified, "Before I really saw him I heard some talk at the corner of the house; as they walked from the alley around to the corner I heard Dunn say 'That fellow is a worse fellow than I am, if you look in his right-hand overcoat pocket you will find a .45 automatic yourself.' "

Detective Frazier testified: "I don't remember whether he told me that this man threatened his life. He told me 'I guess he was after me,—I heard a rap at the door, I figured it was him; when I opened the door he stuck his gun up in my face. I was too quick for him.' "

Two women were found in the house, a young woman in bed upstairs and an older woman downstairs in the back part of the house. Both claimed to have been upstairs in bed and sleeping when the shot was fired and knew nothing of the transaction until the officers started to pound on the door when the older one said she came downstairs to open the door and stumbled onto the body of the dead man, but before she could get the door opened the officers broke in. Shuler testified that as they brought Dunn around through the alley he said: "Get that other woman in the kitchen," and "I want you for a witness, I want you for a witness, I want you for a witness," but she made no reply.

After Dunn had told the officers deceased had an automatic gun in his overcoat pocket Lieutenant Schould looked and found one in deceased's right-hand overcoat pocket. There was a full clip of loaded shells in the magazine but no shell had been thrown into the barrel. The gun taken from the defendant was a .38 caliber revolver with four loaded shells in

the chamber and one empty shell.    The bullet taken from deceased's body corresponded in size with those in the loaded shells.

At the time of his arrest defendant was recognized by the detectives who first drove up after the shooting as the man they had seen about half an hour before while they were patrolling the streets.    They had noticed him standing in the street a few blocks from the scene of the shooting at the corner of Wilkins and Brush streets.    They stopped and asked him what he was doing there and he explained to their satisfaction that he had been out with a party of friends in a car, who had left him there temporarily and were to be back and pick him up soon, and they drove on.

Officers were left in charge of the place and the dead man where found until men from the coroner's office came and took the body.    A photograph was taken of the place and room where the body was found, after daylight that day, and the two revolvers were preserved for evidence in the condition they were when taken.    The dead man was recognized by officers and records of the police department, including thumb prints, as William Riley, *alias* George Kelly. The two women found in the house, who gave their names as Florine Higgins and May Edwards, the latter being the elder one, were taken to the police station and examined, their statements being taken down by a stenographer.    They again denied any knowledge of the shooting except the aftermath as before related, and were released.

Upon the trial the accused's major defense was self-defense, based on his *res gestæ* assertions when arrested and testimony to the effect that Kelly was a gunman of bad character who had made threats against him.    At close of the evidence a motion was made by the defense for a directed verdict on the ground there was no evidence to support a verdict

covering any of the offenses charged in the in-
formation, which was denied.   A motion was later
made for a new trial on that and various other
grounds, which was also denied.   Substantially all
the grounds urged there are brought here for review
on over 20 assignments of error, most of which call
for no serious consideration.   That apparently most
strenuously urged and argued for the defense is that
there was no evidence to support the verdict and, if
any at all is found, it is against the overwhelming
weight of the evidence.   Upon that proposition it is
pointed out that defendant is the only living witness
to the shooting and his undisputed assertions at the
time of his arrest show that he acted solely in self-
defense, to save his life from the assault of a desperate
gunman and criminal who had previously threatened
him, and then attacked him at his home with a drawn
and loaded revolver which he stuck into defendant's
face.

To adopt that theory both the court and jury would
be compelled as a matter of law to accept as absolute
truth defendant's self-serving assertions made after
he came out from his discovered place of hiding back
of the house, not even made under oath for he was
not sworn as a witness, but admissible only on the
theory that they were made so near the time of the
shooting as to be a part of the transaction.   They
were not made until after the shooting was over,
the smoke of which the patrolman testified he saw
come from the front porch of the house.   The door
had been slammed and thrice locked, officers had sur-
rounded the house and demanded admission, defend-
ant had slipped out of a back window and hid in the
dark and his hiding place had been found by the
officers by the spot-light of their auto.   A hat and
a pool of blood were found on the porch outside the
door which was closed and locked with the dead

man lying inside on his back with his feet close to it. But two revolvers were found or claimed to be there. One was taken from defendant's possession and the other, which he accurately described, was found in the dead man's right side overcoat pocket just where defendant said it was.     If he held it in his hand and stuck it in defendant's face when the latter proved to be "too quick for him" and shot him crosswise through the neck, the query would naturally arise as to how that fully loaded and unfired automatic revolver got back into his overcoat pocket after he was shot.     It was for the jury to weigh and pass upon defendant's self-serving assertions made when he was found in hiding and arrested after the shooting.    There was abundant testimony, direct and circumstantial, to carry the case to the jury and we do not find that the verdict was against the overwhelming weight of evidence.

The defense had the right to and did introduce testimony tending to show that deceased's reputation and character were bad, that he was known as a gunman and had made threats against defendant and others, and that the latter knew it.    The prosecution was not at liberty to go into the question of defendant's character, except as the testimony of the defense opened the door for it.    His declaration that "the other fellow is probably worse than I am" introduced a comparative degree of bad for measuring the two men which finds some evidence both ways in the record, even with the prosecution handicapped by the excluding rule of evidence protecting defendant.

At commencement of the trial defendant's counsel moved the court to strike from the information all names by which it alleged defendant was known other than that of John Dunn.    Refusal of the court to do so was pressed as prejudicial error in defendant's motion for a new trial and is insistently urged here.

233—Mich.—13.

While authority may be found tending to support defendant's contention that an unwarranted use of derogatory *aliases* may work prejudicial error, we are not impressed that any such rule is applicable in the instant case. The information indicates like uncertainty as to the real name of both the accused and the man he killed. Testimony not only of the prosecution but of the defense tends to sustain that uncertainty as to both. Detective Frazier testified that defendant gave the officers another name than that of Dunn when they saw him on the street but a short time before the shooting, while defendant's witness Lucille Wolff, who was well acquainted with both men, testified that she knew "this man Riley in his lifetime as Kelly." He boarded and roomed at her rooming house for some time and was sick while there, confined to the house and in bed for about four weeks, during which time she cared for him; that defendant, whom she only knew "by the name of Paul Foley," would call "about every other day or so" to see Kelly; she "heard no argument between them" and they "always got along all right;" that Kelly fell behind in paying his bills and owed her $60 for board and room, besides his medicine bills of $40 which she had paid. Defendant at one time gave her $40 for Kelly. She never got the balance Kelly owed her, and not long before the shooting she ordered him to leave her house.

Payment of the $40 to her by Dunn for Kelly seems to have been the cause of some friction between the two men. Her account of it is that she afterwards went one evening with a girl friend to a near beer saloon on Brush street run by a man named Kenney where she saw Riley and Foley together. She was in the back room and heard them in the front part arguing about that $40. Riley called her out and said Foley was "making a big fellow of himself

by paying me the $40." What she said or how serious the argument was she does not disclose, but said she left there that night about 11:30 with Foley. They went to a cabaret at Alfred and Beaubien, and Foley saw her home "around 3 o'clock."

Kenney, who had brought Kelly to her house to rent a room, knew both men as patrons of his place and was called as a witness for the defense. He said they were arguing that night about some $40, and he asked them to keep quiet; that after the woman came out from the back room and had left with Dunn Kelly kept on arguing, said amongst other things, with a vulgar oath, "I will get him" and slammed the door when he went out; that he (Kenney) saw Dunn later that night and told him what Kelly had said. He also told of Kelly getting very angry one evening in his saloon at some Finlanders and pulling his gun when a big Finlander said something to him, declaring "he would run him back to his own country until he could speak English." He however did no shooting and when Kenney told him "You get out of here" he "walked out and down the street." Though the police department had a record of Riley, *alias* Kelly, and defendant's testimony is to the effect that he was known as a dangerous character and bad gunman, we fail to find in this record any evidence that he ever shot, or shot at, any one or was ever convicted of any criminal offense. The defense was at liberty to prove any acts of violence by him with or without a gun tending to show his dangerous disposition, which had come to defendant's knowledge.

Numerous assignments of error are urged for defendant based on selected excerpts from the charge isolated from the context, and refusal to give certain of defendant's requests.

It is first strenuously contended that the court fatally erred in failing to instruct the jury as to the

meaning of malice, and in charging that "By express malice is meant an actual intention to kill."

It is true that the court did not assume in set phrases to formulate an exact definition of malice in the abstract. But as applied to the case in hand we are impressed the jury was fairly informed of the import of the word malice. Homicide in its various legal aspects, including justifiable or excusable homicide, the three criminal homicides consisting of murder in the first and second degree and manslaughter were carefully explained at length in the charge. The court correctly defined murder, closely following previous definitions by this court, emphasizing malice aforethought as an element, correctly pointed out and illustrated the distinction between justifiable, excusable and felonious or criminal homicide, and defined manslaughter as "the unlawful killing of a human being, but without malice expressed or implied." Of murder the court said in part:

"Murder is divided into two degrees,—first and second. The difference between murder in the first degree and murder in the second degree is that in murder of the first degree there must be premeditation and deliberation and such a lapse of time as will give the mind time to calculate the purpose and intent of the killing.

"Murder of the second degree is where there is malice, but which arises of a sudden previous to the killing, as for instance where two men start a quarrel, and one of them could have retreated and made his escape from the other without any fear of his life or any great bodily harm, but suddenly forms malice and intent to kill. In such a case it would be malice aforethought, but not premeditated and calculated malice, and would be murder in the second degree. Malice aforethought is therefore as much an essential ingredient of murder of the second degree as in murder of the first degree."

It is true that in the course of explaining the nature and difference between those offenses the court rather

inaptly said express malice "meant an actual intention to kill" but in connection with what more was said upon the subject and the very plain, full and apparently favorable to defendant, instructions on the law of self-defense as applied to the issues of fact in this case, we cannot conclude that such lack of technical accuracy misled the jury.    The record fails to show any request by the defense for specific instructions as to malice.    We think it apparent that in defining and explaining distinctions in the grade of offenses covered by the information the court fairly made clear that malice included all those evil conditions of mind attending or impelling a homicide without extenuation, excuse or legal justification.    In practical application legal refinements of definition over which those learned in the law often differ are of scant aid to a jury.

"If the jurors are told what constitutes legal justification or excuse, and what circumstances will reduce the killing to manslaughter, they have all the law they need to determine whether the particular homicide is murder or not, without the mention of the word malice."    13 R. C. L. p. 773.

*Vide,* also, *State* v. *Fuller,* 34 Mont. 12 (85 Pac. 369, 8 L. R. A. [N. S.] 762, 9 Ann. Cas. 648).

Error is also urged against the following portion of the charge:

"If at the conclusion of the case the proofs put in by either the State or the defendant leave your mind equally or exactly balanced, so you cannot say that the State has established proof of the claim it will be then your duty to acquit the respondent, for the prosecution will then have failed to establish the respondent's guilt to you beyond a reasonable doubt."

It is claimed by the defense that this instruction "left the jury under the impression that it is the duty of the defendant in a criminal case to balance the testimony offered by the State before the jury has a reason-

able doubt of the guilt of the accused." We think the context shows to the contrary. The excerpt quoted from is the last sentence in a paragraph giving in substance a request of the defense most favorable to the accused, directly followed by a paragraph reading in part as follows:

"Throughout the case you must presume that the respondent is innocent until his guilt has been established beyond a reasonable doubt. You are to take the presumption of the respondent's innocence with you to your jury room and consider all the testimony in view of and in connection with that presumption. In other words, the respondent is presumed to be innocent at the outset of the trial and this presumption remains with him throughout the entire trial and during your deliberations until you are satisfied that the State has overcome that presumption by competent proof of respondent's guilt, then you may convict him.  *  *  *  Your verdict must represent the honest opinion of each and every one of you. If after deliberating in your jury room there is a doubt in the mind of one or more that he is convinced beyond a reasonable doubt that the respondent is guilty, it will be the duty of that juryman or jurymen, to adhere to that opinion until reasonable argument by one of his fellow jurors convinces him beyond a reasonable doubt of the respondent's guilt."

Complaint is also made of the court's failure to give defendant's request to charge that shortly after the shooting officers found an automatic revolver upon deceased's person and they might consider that fact as bearing upon the claim "deceased drew a gun on the accused and attempted to take his life." The gun found in deceased's overcoat pocket after defendant's arrest in the condition when found was introduced in evidence, exhibited to the jury and its mechanism explained, with all the circumstances of where and when it was found. While the court did not give the language of the request the comprehensive and repeated instructions given the jury on the

law of self-defense substantially covered the thought contained in that request. Self-defense was the prominent issue in the case, the court dwelt at length upon that subject in its various phases, told the jury that "A man in his domicile, in his home, may meet the invader at the threshold and resist his intrusion even to the taking of life" referred to the drawing of revolvers in illustrating the circumstances under which killing the assaulter would be justified and in conclusion of the detailed instructions on that subject said:

"Now if you find that the defendant did kill the deceased, you must further find that he did it not in self-defense, you must be satisfied beyond a reasonable doubt that the offense that he committed, the homicide, was a felonious homicide that was not excusable, a homicide that was not done in self-defense."

The charge of the court covers 11 pages of the printed record. As a whole it fairly and fully submitted to the jury the issues raised by conflicting testimony, with careful explanation of the nature of the charge against the accused and the various rules of law prescribed for his protection during the trial, some of them repeated and painstakingly elaborated to cover defendant's requests. A careful examination of the charge is convincing that the substance of proper requests by defendant not given verbatim was covered by the general charge.

We find no reversible error and the judgment will stand affirmed.

MCDONALD, C. J., and CLARK, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.