## PEOPLE *v.* ROGER JOHNSON.
### OPINION OF THE COURT.

1. CRIMINAL LAW — TRIAL — CROSS-EXAMINATION — DISCRETION OF TRIAL COURT — APPEAL AND ERROR.

   Control of cross-examination in a prosecution for a crime is left to the sound discretion of the trial court, and where derogatory questions are asked of a witness, it is for the trial court to control such conduct and its rulings will not be reversed on appeal except on a showing of abuse of discretion.

2. CONSTITUTIONAL LAW — CRIMINAL LAW — SELF-INCRIMINATION — WAIVER.

   Defendant's constitutional right to refuse to answer any question material to his prosecution for crime is waived by defendant when he takes the witness stand.

---

REFERENCES FOR POINTS IN HEADNOTES

*Opinion of the Court.*

[1] 58 Am Jur, Witnesses § 621.
Cross-examination of character witness for accused with reference to particular acts or crimes, 47 ALR2d 1258.
[2] 58 Am Jur, Witnesses § 95.
[3, 4] 5 Am Jur 2d, Appeal and Error § 809.
[5] 30 Am Jur 2d, Evidence § 1176.
[6, 8, 9] 53 Am Jur, Trial § 506.
[7] 53 Am Jur, Trial § 554.

*Dissenting Opinion.*

[10] 30 Am Jur 2d, Evidence § 1175.
[11–14, 16, 17] 29 Am Jur 2d, Evidence § 339 *et seq.*
[15] 53 Am Jur, Trial § 69.
[18] 58 Am Jur, Witnesses § 649.

3. CRIMINAL LAW—APPEAL AND ERROR—CROSS-EXAMINATION—TESTI-
MONY—CREDIBILITY OF WITNESS—PROOF.

Cross-examination of defendant by the prosecutor as to incidents
occurring before the stabbing of deceased, for which defendant
is being tried, with the purpose of bringing from defendant
his own evaluation of his character and to refute his claim
of being a calm man *held,* without error in prosecution result-
ing in conviction of second-degree murder, where there was
no attempt to create a wrongful impression in the minds of
the jury and the judge had charged the jury at the time of
the cross-examination that all such testimony went only to the
question of credibility and was not to be considered as sub-
stantive proof of the crime charged (CL 1948, § 750.317).

4. SAME—APPEAL AND ERROR—CROSS-EXAMINATION—PREVIOUS CON-
VICTION—OBJECTION.

Cross-examination of defendant by the prosecutor as to previous
conviction for murder in the second degree *held,* not error in
instant prosecution which also resulted in conviction of second-
degree murder, where this line of questioning was opened up
by defense counsel on direct examination and the trial judge
quickly cut off such questioning upon objection by counsel
(CL 1948, § 750.317).

5. SAME—APPEAL AND ERROR—EVIDENCE—RECORD OF DECEASED—OF-
FER OF PROOF—TESTIMONY—NATURE OF DECEASED.

On the issue of self-defense, the criminal record of deceased was
properly excluded from evidence in trial in which defendant
was charged with killing deceased, a fellow inmate in the State
prison, where defense counsel made no offer of proof nor at-
tempted to introduce the criminal record of deceased in evidence
and where full disclosure of the facts of deceased's criminal
record was made to the defense and witnesses for defendant
were allowed to testify as to the quarrelsome nature of deceased
(CL 1948, § 750.317).

6. SAME—APPEAL AND ERROR—CLOSING STATEMENT—JURY—INSTRUC-
TION—VERDICT—EVIDENCE.

Statement by the prosecutor in his closing argument, that de-
fendant accused of murder could have retreated from his en-
counter with deceased, a fellow inmate in the State prison, and
had given no reason for not doing so, was not error, where
the jury was instructed by the trial judge to find a verdict

from the evidence coming from the witness stand and no other place, that it was for the jurors to determine whether or not claims of counsel were substantiated in whole or in part by evidence produced in open court, and that arguments of counsel were not evidence (CL 1948, § 750.317).

7.. JURY—INSTRUCTIONS—EVIDENCE.

A jury should not have been misled by an instruction from the trial judge that verdict was to be found from the evidence presented by witnesses and that evidence and law as given by the court, not the statements of the prosecutor and defense counsel, are to control the jury in arriving at a verdict.

8. CRIMINAL LAW—BURDEN OF PROOF—SELF-DEFENSE—APPEAL AND ERROR—EVIDENCE—INSTRUCTIONS—OBJECTIONS.

Argument by the prosecutor in his closing statement that defendant accused of murder of a fellow inmate in the State prison would have to prove he was without fault, was not the aggressor, and was in imminent danger of losing his life or suffering grievous bodily injury, in order to sustain his claim of self-defense, was not prejudicial to defendant where the jury was properly charged that arguments of counsel were not evidence or law, that the burden was on the prosecution to show defendant guilty of the offense charged and show sufficient facts and circumstances to convince the jurors that the killing was not in self-defense, and no objection was raised by defense counsel to the jury instructions (CL 1948, § 750-.317).

9. SAME—PROSECUTOR—CLOSING ARGUMENT—APPEAL AND ERROR—HEARSAY—EVIDENCE.

Statement by prosecutor in his closing argument in prosecution for stabbing of fellow inmate in State prison, resulting in conviction of second-degree murder, that there was no evidence, other than testimony of defendant, that no one except defendant had a knife, was not prejudicial error, even though a witness testified that an unidentified inmate nurse told him that deceased had a knife in his possession when brought to the hospital after being stabbed by defendant, for such hearsay statements are not evidence and the jury was cautioned by the court that arguments of counsel are not evidence (CL 1948, § 750.317).

DISSENTING OPINION.

T. M. KAVANAGH, J.

10. CRIMINAL LAW — CHARACTER OF DEFENDANT — EVIDENCE — GOOD
CHARACTER — PRIOR CRIMES — PARTICULAR ACTS — CRIMINAL DIS-
POSITION.

*A prosecutor is prohibited from attacking the character of a
criminal defendant, unless defendant first puts that in issue
by offering evidence of his good character, from showing de-
fendant's bad character by showing particular acts, from show-
ing defendant had a tendency or disposition to commit the
crime with which he is charged, and from introducing evidence
of other crimes of defendant, unless they are connected by
circumstances with the particular crime in issue.*

11. SAME—CROSS-EXAMINATION—CHARACTER OF DEFENDANT—ISSUES
—GOOD CHARACTER.

*Response by criminal defendant on cross-examination that he
characterized himself as a calm person cannot be construed as
having put his character in issue and therefore no rebuttal of
good character was in order.*

12. SAME — CROSS-EXAMINATION — TESTIMONY — SELF-CHARACTER-
IZATION — PRIOR MISCONDUCT.

*A statement of self-characterization cleverly elicited by the pros-
ecutor on cross-examination of the criminal defendant cannot
be used by the prosecutor as a springboard to reach every prior
incident of misconduct by defendant, under the guise of testing
credibility.*

13. SAME—CHARACTER OF HOMICIDE VICTIM—GOOD CHARACTER OF DE-
FENDANT.

*The fact that character of deceased victim was introduced in
the prosecution for murder neither worked adversely nor in-
troduced issue as to defendant's good character.*

14. SAME — REPUTATION OF DEFENDANT — CREDIBILITY — EVIDENCE —
CHARACTER.

*Reputation of a criminal defendant who testifies on his own be-
half is too valuable an asset to be lightly ensnared by the
prosecutor in an attempt to discredit the defendant by showing
defendant had falsely characterized himself, where defendant
offered no evidence of his good character.*

15. EVIDENCE—OPENING STATEMENT—RELIANCE ON STATEMENT.

Opening statements of counsel are not accorded the stature and weight of evidence and a prosecutor's reliance upon a single casual opening remark is unwarranted (GCR 1963, 507.1).

16. CRIMINAL LAW—TESTIMONY—CREDIBILITY—EVIDENCE—CHARACTER.

Credibility of the testimony of a criminal defendant may be tested by the prosecutor only after defendant has directly introduced testimony or proofs as to his good character.

17. SAME — CHARACTER — TESTIMONY — CREDIBILITY — MISCARRIAGE OF JUSTICE.

Previous life and character of a witness may be inquired into to elicit facts which may aid the jury in determining what credence they will attach to his testimony, but where it is manifest that the design or effect of questions is not to elicit facts but to cast suspicion upon the character and credibility of the witness, courts must intervene to prevent a miscarriage of justice.

18. SAME—APPEAL AND ERROR—CROSS-EXAMINATION—CHARACTERIZATION OF DEFENDANT.

Prejudicial and reversible error was committed during trial resulting in conviction of second-degree murder of defendant's fellow inmate in State prison, where it appears upon a review of the trial court record by Supreme Court that the prosecutor's sole purpose in cross-examining defendant was to characterize defendant as a fractious and intractable prison inmate, thereby depriving him of a fair trial (CL 1948, § 750.317).

Appeal from Court of Appeals, Division 2, Quinn, P. J., and T. G. Kavanagh and Corkin, JJ., reversing and remanding Jackson, Dalton (John C.), J. Submitted June 11, 1969. (Calendar No. 11, Docket No. 52,198.) Decided December 1, 1969. Certiorari denied by the Supreme Court of the United States May 4, 1970.

13 Mich App 69, reversed.

Roger Johnson was convicted of murder in the second degree. Defendant appealed to the Court of Appeals. Reversed and remanded. The people appeal. Reversed, and trial court affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Bruce A. Barton,* Prosecuting Attorney, *Paul R. Adams,* Assistant Prosecuting Attorney, for the people.

*William F. Goler,* for defendant.

ADAMS, J.  On October 24, 1965 a stabbing occurred in a hallway outside a dining room in Jackson prison. Frank Clark, a prison inmate, died as a result of knife wounds inflicted by defendant.  The defendant, Roger Johnson, was proceeded against upon an information charging him with murder.[1]  He was found guilty of murder in the second degree by jury verdict.[2]

On appeal to the Court of Appeals, that Court held that the cross-examination of defendant by the prosecutor was improper and that the prosecutor's final argument to the jury with regard to the law as to self-defense constituted prejudicial error.  The Court of Appeals reversed and remanded.  13 Mich App 69.  Upon application to this Court by the prosecuting attorney for Jackson county, leave to appeal was granted.  381 Mich 803.  Six questions were presented.  They will be dealt with in the sequence in which they arose during the course of the trial.

1.

*Was error committed by the prosecutor's examination of defendant in regard to separate, distinct, and unrelated offenses?*

The following is contained in the defense's opening statement:

---

[1] CL 1948, § 750.316 (Stat Ann 1954 Rev § 28.548).—REPORTER.
[2] CL 1948, § 750.317 (Stat Ann 1954 Rev § 28.549).—REPORTER.

"Now, we will bring out through the testimony of this witness, the defendant, who will take the stand, incidentally, something about his background, such as will be material to you so that you can get some idea of what kind of man the defendant is."

During direct examination of defendant by his attorney, it was brought out that defendant was an inmate at the State Prison of Southern Michigan because of a murder which was committed while defendant was with someone who killed another fellow.

Upon cross-examination, defendant was asked:

"*Q.* Would you characterize yourself as a calm man or an excitable one?

"*A.* I characterize myself as being calm."

Thereupon, without objection, defendant was questioned with regard to various incidents that had occurred in prison involving prison guards and convicts. The questioning by the prosecutor was straightforward. Defendant was simply asked to tell about or to explain incidents inside the prison that would make him irritable.

Finally, he was questioned with regard to an incident that occurred on May 18, 1966. The objection made by his counsel was sustained by the court, the judge ruling that the incident was too far beyond the date when the stabbing occurred.

The prosecutor then endeavored to go into an incident that occurred about a month before the stabbing. An objection was again made. The objection was overruled. The court stated:

"The only purpose for which they are being offered is on this question of the disposition of the defendant, which is already in issue now. It is in the record.

"I assume that is the only purpose it is being offered. Is that correct? * * *

"*The Court:* The jury will so understand that is the only purpose they are being offered for. They are not substantive proof and shall not be considered so by the jury as to the commission of the offense on October 24, 1965, the stabbing, an alleged stabbing, I am referring to."

The prosecutor then proceeded to question the defendant with regard to a number of incidents, all of which occurred prior to the stabbing on October 24, 1965. One of the passages in this cross-examination is the following:

"*Q.* O.K. Then, December 24, 1964, you were written up for assault on another convict. Do you remember that?
"*A.* 24?
"*Q.* 1964.
"*A.* What?
"*Q.* December 24th.
"*A.* December. Yes.
"*Q.* Do you remember having an argument?
"*A.* Yes.
"*Q.* You called it not an argument. You called it a discussion in talking to the officer, and you told— the officer separated you, and then you followed the other man and had a fight after the officer left. Do you remember that?
"*A.* Yes, we did.
"*Q.* Can you explain that?
"*A.* It was a fight.
"*Q.* You were going to settle something man to man, is that right?
"*A.* He requested the fight.
"*Q.* Any time somebody requests to fight, you go along with it, is that right?
"*A.* No, I don't. I would try and avoid it to the best of my ability.
"*Q.* In this case you followed him?
"*A.* We was going in the same direction. The fellows separated us."

Following the above questioning when the prosecuting attorney attempted to go into an incident that occurred three months after the stabbing, upon objection that "incidents that occurred subsequent to this matter" would be irrelevant and immaterial, the court ruled, as before, that such incidents were too remote and this line of questioning concluded.

The testimony on cross-examination has been presented at some length in view of the holding of the Court of Appeals that "Such conduct by the prosecutor, in this case, created a highly prejudicial atmosphere for the defendant." 13 Mich App 69, 72.

As a general rule, the extent and control of cross-examination in a prosecution for a crime is left largely to the sound discretion of the trial court. *People* v. *Fedderson* (1950), 327 Mich 213. If derogatory questions are put to a witness, it is for the trial court to control such conduct (*People* v. *Davis* [1912], 171 Mich 241), and its rulings will not be reversed except on a showing of abuse of discretion.

When a defendant takes the stand, he waives his constitutional right to refuse to answer any question that may be material to the case and which would, in the case of any other witness, be legitimate cross-examination. *People* v. *Dupounce* (1903), 133 Mich 1. In this case, the entire trial revolved around the question as to whether or not defendant had stabbed in self-defense or had committed murder.

In deciding the question of proper cross-examination of defendant as to other incidents, the Court of Appeals considered the following cases decided by this Court:

*People* v. *Boske* (1922), 221 Mich 129, 135, states "an accused's character or reputation cannot be put in issue by the State." In the present case, defendant's character was placed in issue by the defense in the opening statement.

In *People* v. *Hill* (1932), 258 Mich 79, on cross-examination of defendant's good character witnesses, the prosecuting attorney asked questions with regard to incidents he assumed the witnesses knew nothing about but which the prosecutor suggested might subsequently be developed during the trial. The cross-examination was held to be improper since it did not go to test the witnesses' credibility or knowledge of defendant's reputation and good character.

In *People* v. *Pinkerton* (1889), 79 Mich 110, testimony of various persons that tended to vilify the respondent was used to convict the respondent of keeping a house of ill fame. A majority of the Court held that the respondent had not had a fair trial because the two issues which were pertinent to the criminal charge were lost sight of in the mass of testimony.

*People* v. *Wright* (1940), 294 Mich 20, differs from the present case because of the crime charged. In *Wright*, the defendant was charged and convicted of manslaughter. There was no charge, as here, of murder. In that case "the prosecuting attorney by inference or insinuation gave the impression to the jury that defendant had made improper use of his gun on other occasions." The Court held that in the prosecution of a crime which did not involve the element of motive, intent, scheme, or plan, the cross-examination as to prior incidents indicating motive or intent should have been excluded.

In the present case, the court confined the cross-examination to incidents which occurred prior to the stabbing. No attempt was made by the prosecutor to create a wrongful impression in the minds of the jury by insinuation or by innuendo. Rather, the questioning was calculated to bring from defendant his own evaluation of his character and to re-

fute his claim of being a calm man. Finally, the judge at the very time of cross-examination was careful to charge the jury that all such testimony went only to the question of credibility and was not to be considered as substantive proof as to the commission of the offense on October 24, 1965. The cross-examination was proper. No error was committed.

2.

*Was error committed by the prosecutor's examination of defendant in regard to the details of the previous conviction of murder in the second degree?*

As above noted, counsel for defendant on direct examination first brought up the subject of defendant's previous conviction of murder in the second degree. At that time defendant's counsel attempted to go into the details of the earlier crime. Upon objection by the prosecuting attorney, this line of questioning was halted by the judge. Upon cross-examination, the prosecutor elected to question defendant with regard to the earlier crime. This line of questioning was objected to by defendant's counsel. The court again ruled that such questioning should not be pursued. It was not improper for the prosecution to question defendant with regard to his prior conviction in view of the fact that this line of questioning was opened up by defense counsel on direct examination. The questioning was quickly cut off by the trial judge. No error was committed.

3.

*Did the trial court err in refusing to permit the introduction of the criminal record of the deceased at the time of the trial of this cause?*

The criminal record of the deceased, Frank Clark, was brought into court by *subpoena duces tecum.*

Upon the commencement of the trial, the court made the following statement:

"*The Court:* Now, defense counsel and the prosecution have reviewed the Michigan State Police bureau of identification record concerning the deceased, from which it appears that he has offenses commencing in July, 1948, and up to and including the offense for which he was last imprisoned. That does not appear on the official record but it is a part of the file. And the offenses listed therein are in the order thereof: breaking and entering an automobile; investigation of breaking and entering; investigation of breaking and entering in 1948; attempted larceny from an automobile in October, 1948; breaking and entering in December of 1950, which was nolle-prossed; an assault and battery conviction in Detroit, for which the deceased received 90 days in the Detroit House of Correction back in 1952, which, of course, would be too remote to have any bearing on the matter before the court and the jury today. On February 3, 1953, there was a probationary sentence given for a charge of breaking and entering nighttime. There is no disposition shown of a breaking and entering charge in May of 1954. Also in May of 1954 there was an investigation of grand larceny which was dismissed when the complainant refused to sign a complaint, and on July 7, 1955, the deceased was arrested for possession and sale of draft cards. No disposition is shown. And then there was the offense of breaking and entering on July 20, 1960, for which the deceased received a sentence of 2-1/2 to 15 years; and then the last offense for which the deceased was sentenced on October 7, 1963, for the offense of possession of burglar tools.

"Now, defense counsel has requested permission to examine this file, and the court at this time, having furnished to defense counsel the information which has already been stated on the record, is going to reserve its ruling until such time as the defense of self-defense has been introduced in this case, and then we will cross the bridge at that time."

During the presentation of the defense, the judge ruled as follows:

"I want to go into this matter of your requesting that the prison record of Mr. Johnson be produced for your examination, and the court at this time is going to deny that for the reason that if Mr. Johnson at the time this incident occurred had no knowledge of anything that should happen to be in that file, it could have no bearing on his state of mind, anyway, and anything else that is in there that had a bearing on his state of mind he should know about himself; so your request for examination of his prison record is denied.

"*Mr. Barton:* May it please the court, is that Mr. Clark's prison record you are referring to?

"*Mr. Goler:* Yes."

It was the contention of defendant that the quarrelsome and argumentative nature and disposition of the deceased had already been placed in evidence by many inmates who testified for the defense and that, therefore, the criminal record of the deceased should have been admitted in evidence as directly bearing upon the kind of person the deceased was. However, we find in the transcript of the trial no offer of proof or even an attempt to introduce the record in evidence. On the record before us, the facts contained in deceased's criminal record would have been wholly immaterial and irrelevant. Furthermore, there was a full disclosure of these facts to the defense for what use the defense might have been able to make of them. Also, it may be noted in passing that testimony of witnesses for defendant with regard to the quarrelsome nature of the deceased was allowed. We find no error.

4.

*Was error committed by the prosecutor in his argument to the jury that defendant had the burden of proving the "three points of self-defense"?*

5.

*Was error committed by the prosecutor in his argument to the jury that "it is uncontradicted that the defendant could have retreated"?*

6.

*Was error committed by the prosecutor in his argument to the jury that "there is no evidence in this case other than what the defendant has told us, that anybody had a knife other than defendant"?*

Since these questions all go to the closing argument of the prosecutor, and since they are interrelated, the questions will be treated together.

During the course of the closing argument by the prosecutor, the following took place:

"It is uncontradicted that the defendant could have retreated, and he gives no reason whatsoever as to why he did not.

"He was asked on cross-examination—

"*Mr. Goler:* If the Court please—

"*Mr. Barton* (continuing): —'could you?'

"*Mr. Goler:* If the Court please, I do not want to interrupt any more than I can help to do so, but I think that counsel is misstating this.

"There is no evidence here of any uncontradiction of this man's retreat and so forth.

"I think that that is improper. This is a question of fact for the jury.

"*The Court:* Let me state this to you, jurors; Arguments of counsel—this applies to both Mr. Barton and to Mr. Goler—argument of counsel are not evidence, and if the arguments of counsel do not con-

form to the facts as you jurors find them to be from the evidence in the case, then you disregard any portions of the argument of counsel which are in conflict with the facts as you find them to be. Go ahead, Mr. Barton.

"*Mr. Barton:* Thank you, Your Honor.

"Ladies and gentlemen of the jury, I, of course, have no intention to say anything in this argument that is to be construed by you as evidence. The only evidence the people wish that you consider is what you heard from the witness stand.

"What I am about to say this morning is strictly argument, it is strictly what I feel should be taken from the facts which you heard from the witness stand.

"So, if I make any statement, I do not intend it to be a statement of fact but merely something reflecting the testimony and the obvious inference that can be drawn from it.

"On that point, I will state the point in a different manner. On cross-examination I asked Mr. Clark [sic] directly: Could you have gone through the open door? And after some hesitation he said yes, he could have gone through the open door; and he didn't really give you any reason why he didn't. I leave that for your consideration.

"It is uncontradicted that Mr. Clark was in the act or process of leaving the dining room and he had his tray in his hand after leaving the dining room and he was on his way out; that Mr. Johnson, a waiter in the dining room, actually followed him out. Although there is one man who said Mr. Johnson might have been out there in the first place."

The cross-examination to which the prosecutor referred in his closing argument appears in the record as follows:

"*Q.* And at that point, of course, the door was open behind him and there were two guards immediately behind him, is that right?

"*A.* No, they wasn't.

"*Q.* They were just inside that door, weren't they?

"*A.* Yes, they was.

"*Q.* You could have gone through the open door very easily, but you felt you had to defend yourself. by pulling the knife out, is that right?

"*A.* When he reached for his knife, it was the only one way left for me.

"*Q.* Right. To pull your knife and going to get into the battle man-to-man, right?

"*A.* No, it wasn't.

"*Q.* What other way was open to you then?

"*A.* The way was open to me at this point to pull out the knife and try to stab this guy in a way not to kill him or anything, just to—to keep him from killing me, to keep—I am quite satisfied with my appearance and so forth and I would like to keep them in the same way they are in.

"*Q.* I see. But you pulled out the knife and used it on Clark rather than going through that open door immediately behind you?

"*A.* If the police were there, you testified.

"*Q.* Just answer yes or no, please. Did you pull out the knife and use it on Clark rather than going through the open door right behind you?

"*A.* Yes, I did."

The jury should never have been misled that the evidence and the law as given by the court, not the statements of the prosecutor or the defense attorney, were to control.

In his opening statement, counsel for the defense said:

"The evidence in this case will emanate from all the witnesses who testify from this witness stand under oath, and I believe the court will tell you it is that evidence upon which you must base your decision as to the facts, what the facts are."

The judge charged the jury:

"Under the instructions I give you, find your verdict from the evidence in this case that has come

to you from the witness stand and from no other place. * * *

"And you will be guided solely by the evidence and the law as the court shall give it to you in arriving at your verdict.

"It is for you, jurors, to say whether or not those claims have been substantiated in whole or in part by the evidence that has been produced here before you in open court. * * *

"Now, jurors, I have already instructed you that arguments of counsel are not evidence."

With regard to the elements involved in a claim of self-defense, in his closing argument the prosecutor said:

"Now, I believe you will find that the judge will instruct you—and I wonder if you would listen for these instructions—that there are three things that must be established in order to sustain the claim of self-defense. First, it must be established that the defendant, Roger Johnson, was without fault on his part and, further, that he was not the aggressor in bringing on the difficulty, unless there was in his mind a belief that he was in imminent danger of losing his own life or suffering from some grievous bodily injury."

The prosecutor thereupon proceeded to argue his version of the facts and the reasons he believed self-defense had not been made out.

Counsel for defense in his closing argument stated:

"*Mr. Goler:* I believe that the court will instruct you that Roger Johnson does not have to prove to you that he killed Frank Clark in self-defense. But, rather, that the prosecutor must prove to you beyond a reasonable doubt that Roger was not acting in self-defense or in the defense of his person when he killed Frank Clark; and if the prosecutor should fail to

prove that, then your verdict must be one of not guilty for the defendant."

The prosecutor, in rebuttal for the people, stated:

"Mr. Goler is correct that the burden in a criminal trial is on the prosecution to prove their case beyond a reasonable doubt."

The trial judge's charges to the jury on self-defense were not objected to by defendant's counsel. The judge's charge regarding self-defense is approximately five pages in length in the transcript of the charge. It includes the statement:

"Now, jurors, in all cases where this defense is made, the burden is upon the people to show that the accused is guilty of the offense charged and to show such facts and circumstances as convince the jurors that the killing was not done in self-defense."

The defense attorney in his opening statement was careful to point out:

"The defense which we will impose [interpose?] here today will be that of the defense of the person or self-defense. *The court will also instruct you that if the proper ingredients are present, self-defense is a valid defense.* In other words, there are some conditions under which a human life may be taken and it may be justifiable." (Emphasis added.)

As was stated by the trial judge, arguments of counsel are not evidence nor are they the law. The jury was correctly charged by the trial judge. No exception was taken to that charge. Under the circumstances of this case, the prosecutor's argument with regard to self-defense was not prejudicial.

Finally, as contradicting the statement by the prosecutor in his argument to the jury that "there is no evidence in this case, other than what the defendant has told us, that anybody had a knife other

than the defendant," the following cross-examination of the people's witness, Mr. Colladay, has been directed to this Court's attention:

"*Q.* Did you know that Clark carried a knife?

"*A.* It did come as a surprise when the people in the first aid told me that they found a knife on him. I wasn't aware he had a knife.

"*Q.* Who told you that, Mr. Colladay?

"*A.* Just the general people working in the first aid. I don't remember who.

"*Q.* That was shortly after this incident occurred, was it not?

"*A.* Yes, it was.

"*Q.* That they found a knife on him?

"*A.* Yes.

"*Q.* You didn't happen to see this knife fall to the floor, did you?

"*A.* The knife that Frank was supposed to have had?

"*Q.* That is right.

"*A.* No, sir, I didn't."

The transcript also contains the following testimony of Colladay:

"*Q.* Who told you that he had had a knife in his possession at the time he was taken into the hospital?

"*A.* One of the nurses working in first aid.

"*Q.* By 'one of the nurses,' is this a civilian nurse or inmate?

"*A.* No, sir; an inmate.

"*Q.* An inmate. Did the inmate tell you what was done with the knife?

"*A.* No. He only mentioned that Frank had had a knife.

"*Q.* Did he tell you that he reported this to any of the civilian personnel of the hospital?

"*A.* It wasn't—there wasn't any conversation taking place. It was just a remark: 'Well, he had a

knife,' or 'He had a knife, too.' That is the only way I knew that, that he had a knife.

"Q. Strictly hearsay then, is that right, as far as you are concerned?

"A. Well, I didn't see any. I didn't see it. I don't know."

The hearsay statements of witness Colladay scarcely rise to the dignity of evidence. Even if this testimony is considered, the argument of the prosecutor was not prejudicial in view of the court's careful cautionary statements to the jury above quoted that "arguments of counsel are not evidence."

Upon a review of all of the questions raised by defendant, we find no error. The Court of Appeals is reversed. The trial court is affirmed.

T. E. BRENNAN, C. J., and DETHMERS, KELLY, and BLACK, JJ., concurred with ADAMS, J.

T. M. KAVANAGH, J. (dissenting). The defendant, an inmate of the State Prison of Southern Michigan, was tried by jury in Jackson county for the murder of Frank Clark, a fellow inmate, and was found guilty of murder in the second degree. (CL 1948, § 750.317 [Stat Ann 1954 Rev § 28.549].)

From this conviction defendant appealed to the Court of Appeals, claiming irregularities at the trial even though he was represented by court-appointed counsel. The Court of Appeals, upon grounds which shall be herein discussed, reversed and remanded for a new trial. 13 Mich App 69. From this decision the prosecutor filed delayed application for leave to appeal, and this Court granted his application. 381 Mich 803.

The crucial and composite issue raised in this appeal is whether reversible error was committed by the prosecutor's cross-examination of the defendant

as to his good character and in regard to separate, distinct, and unrelated offenses.

On this point, the record discloses the following cross-examination of the defendant at trial:

"*Q.* [By Mr. Barton, assistant prosecutor] Mr. Johnson, you are left-handed, is that correct?

"*A.* That's correct.

"*Q.* You took the oath with your left hand, is that right?

"*A.* Yes, sir.

"*Q.* How tall are you?

"*A.* Six one and a half.

"*Q.* Would you characterize yourself as a calm man or an excitable one?

"*A.* I characterize myself as being calm.

"*Q.* I see. At any time while you have been in prison have you lost that calm attitude on occasion?

"*Q.* On occasions I have had tension on me, what make me irritable.

"*Q.* What sort of tension would make you irritable?

"*A.* My mother is most sick all the time.

"*Q.* Would any sort of incident inside the prison make you irritable?

"*A.* Possibly.

"*Q.* Possibly. What sort of incident would that be, please?

"*A.* A number of things. It might be every week or a month or so.

"*Q.* What sort of things would build up on you, please? People bothering you, would that build up on you?

"*A.* I didn't have too much trouble about anybody bothering me, because I didn't bother anybody.

"*Q.* You haven't had much trouble inside the prison about people bothering you?

"*A.* Not exactly.

"*Q.* What do you mean by 'not exactly'? Have you had trouble with guards or other inmates bothering you inside the prison?

"*A.* I have had a few troubles with guards.

"*Q.* What sort of troubles?

"*A.* With who are you—

"*Q.* (Interrupting) With guards.

"*A.* With guards? In the way they would address me.

"*Q.* In the way they would address you. You don't like the way they address you, is that right?

"*A.* No, I don't.

"*Q.* How do they address you? What bothers you about that?

"*A.* In a boiley [sic] fashion, like I am a child.

"*Q.* When guards or other inmates have used that kind of approach to you, you become irritable, is that right?

"*A.* No, that isn't what I mean.

"*Q.* Well, tell me what you mean then, please.

"*A.* What I mean, that this one incident wouldn't make me irritable. It would make me—I am a convict, but I am a convict second and I am a man first.

*Q.* You are going to make sure everyone knows you are a man, is that right?

"*A.* No. It is not in that fashion you are implying.

"*Q.* Let's get back to the original question.

"Have you become irritable and been involved in any disturbance at the prison because you felt people were harassing you or getting after you?

"*A.* I became involved with officers and convicts, but it wasn't because I felt irritable.

"*Q.* Why was it, please?

"*A.* In this institution, if you are familiar with it—

"*Q.* (Interrupting) Just tell me what it was, please. Go ahead.

"*A.* I can't answer yes or no.

"*The Court:* You do not have to. He asked you to tell him why.

"*The Witness:* What—I proceeded to tell him why.

"*The Court:* Go ahead.

"*A.* In this institution, you—they want you to do whatever they say for you to do as the command, whether they are wrong or right. You are supposed to do it.

"If they say, 'shine my shoes,' shine your shoes, or you get a ticket wrote up on you.

"*Q.* [By Mr. Barton] You sometimes objected to that, is that right, and had tickets written up on you?

"*A.* Yes.

"*Q.* And you would become irritated about that?

"*A.* No, I didn't.

"Tickets were wrote, as you may observe in the records of the incident, but because I would tell him—I say, 'If you wish for me to do something, tell me in a way so that I can understand. Don't shout at me anything like you did, and normal. Just explain. Just tell me you want me to go to the hall office or whatever you want me to do.'

"*Q.* Mr. Johnson, to find out what sort of situation would make you react, let's take something that happened less than a month ago.

"Were you involved at that time in a quarrel with Officer Grinnell and Officer Bailey in the prison?

"*Mr. Goler* [defendant's attorney]: If the Court please, barring any argument with the deceased, I do not see that this is relevant or material.

"*Mr. Barton:* Your Honor, only that his disposition in this case, in this particular crime especially, since he has characterized himself as a calm person, is very much relevant and material.

"*The Court:* We are talking about something that happened some time after the incident in question here, aren't we?

"*Mr. Barton:* Yes, your Honor, but about half a year afterwards; but, nevertheless, the same person is involved and under the same circumstances, the prison conditions.

*"The Court:* We have a lot of unknown factors involved here, I think, without a proper foundation. We can't go into that. That is too far beyond the incident in question here.

*"Q.* [By Mr. Barton] Did you have a ticket written on you, then, on October 25, 1965, about 11 days—I am sorry—the day after this incident?

*"A.* No, I didn't.

*"Q.* I am sorry. September. On September 25, 1965, a month before the incident?

*"A.* Yes, I did.

*"Q.* That was for refusing a direct order in a manner extremely insolent, is that correct?

*"A.* No, it wasn't.

*"Mr. Goler* [defendant's attorney]: If the Court please, again I do not think that this is relevant, and I do not think that it is material here to this case at all.

"I think that perhaps the prosecutor might bring up any number of little, petty things here, but they don't have anything to do with this case.

*"Mr. Barton:* May it please the Court, this man is on the witness stand. Both his credibility and, in this particular case, his disposition toward violations and his entire mannerism are issues in the case.

*"Mr. Goler:* If the prosecutor has some criminal record of this man that he wants to put into evidence, any convictions of felonies, arrests, to go to his credibility, I think it is material; but for infractions of the rules at Southern Michigan Prison, I don't think it would be material or relevant in this case.

*"The Court:* The only purpose for which they are being offered is on this question of the disposition of the defendant, which is already in issue now. It is in the record.

"I assume that is the only purpose it is being offered. Is that correct?

*"Mr. Barton:* Yes, Your Honor.

*"The Court:* The jury will so understand that is the only purpose they are being offered for. They are not substantive proof and shall not be considered

so by the jury as to the commission of the offense on October 24, 1965, the stabbing, an alleged stabbing, I am referring to.

"Go ahead, Mr. Barton."

It is the people's position that defense counsel had put defendant's character in issue by stating in his opening remarks that defendant would take the stand to show "what kind of man he is" and that upon taking the stand both defendant's character and credibility were in issue. Refuting this position as untenable and prejudicial to a fair trial, the Court of Appeals stated (pp 71, 72) :

"The argument offered on appeal must fail. The character of a defendant cannot be attacked unless he first puts it in issue by offering evidence of his good character. Defendant's response on cross-examination can in no way be treated as having put his character in issue and, consequently, no rebuttal of good charatcter was in order. See *People* v. *Boske* (1922), 221 Mich 129. Furthermore, had defendant put his character in issue, it is still error to introduce specific acts of misconduct to prove a bad character. *People* v. *Hill* (1932), 258 Mich 79. The prosecutor cannot use a statement of self-characterization, cleverly elicited on cross-examination of defendant, as a springboard to reach every prior incident of misconduct, under the guise of testing credibility. On this theory, the evidence was inadmissible."

We agree with the decision of the Court of Appeals.

It is a well-settled rule, adopted by this Court in *People* v. *Minney* (1909), 155 Mich 534, 540, that:

" '(1)It is not permitted to the prosecution to attack the character of the prisoner, unless he first puts that in issue by offering evidence of his good character; (2) it is not permitted to show the defendant's bad character by showing particular acts; (3)

it is not permitted to show in the prisoner a tendency or disposition to commit the crime with which he is charged; (4) it is not permitted to give in evidence other crimes of the prisoner, unless they are so connected by circumstances with the particular crime in issue as that the proof of one fact with its circumstances has some bearing upon the issue on trial other than such as is expressed in the foregoing three propositions.' "

We cannot find a single instance in the entire record where defendant offered "*evidence* of his good character." The bulk of the testimony relating to "character" was given by defense witnesses and dealt exclusively with the character of the deceased, depicting him as argumentative and bellicose. This was permissible (*People* v. *Dunn* [1925], 233 Mich 185) and neither works adversely nor introduces defendant's good character. See 1 Jones, Evidence (5th Ed), § 172, p 305; 1 Wharton's Criminal Evidence (12th Ed), § 228. The only testimony relating to defendant's good character, other than the objected to cross-examination of defendant, came from a witness for defendant, but this also was elicited upon cross-examination by the prosecutor.

The only justification for the attack upon defendant's character is readily acknowledged by the people in its brief:

"In the instant case when the defendant took the witness stand his credibility was in issue. In addition, he took the stand, according to his attorney's opening statement, *for the express purpose of showing 'what kind of man he is'*. In view of this, the prosecuting attorney asked the defendant whether he was a calm person; the defendant so characterized himself. The prosecutor then by a series of questions concerning defendant's infraction of prison rules sought to discredit the defendant by *showing that the defendant had falsely characterized himself.*

The purpose of the prosecutor's examination enumerated above went to the defendant's credibility."

We feel, however, that a man's reputation, especially where he is also the criminal defendant-witness, is too valuable an asset to be lightly ensnared by such insidious adversary tactics and tenuous reasoning.

Opening statements of counsel are not accorded the stature and weight of evidence and a prosecutor's reliance upon a single casual opening remark is unwarranted. GCR 1963, 507.1; *Ambrose v. Detroit Edison Company* (1968), 380 Mich 445; *People v. Koharski* (1913), 177 Mich 194. It is only after defendant has directly introduced testimony or proofs as to his good character that the prosecutor may test the credibility of the testimony or discredit those proofs as they relate to defendant's character. See *People v. Neal* (1939), 290 Mich 123; *People v. Dunn, supra; People v. Boske* (1922) 221 Mich 129.

The failure to make this initial distinction quite naturally and inevitably leads to a precipitous compounding of errors. Once we allow the prosecutor to predicate cleverly elicited statements of self-characterization upon inadvertent and casual opening remarks, we must permit him to test the credibility of such testimony. But neither the initial error nor its cumulative effect can be sanctioned.

We would adhere to the rule stated in *People v. Gotshall* (1900), 123 Mich 474, 483:

"While it is the well-settled rule that the previous life and character of a witness may be inquired into to elicit facts which may aid the jury in determining what credence they will attach to his testimony, yet it is the duty of the courts to keep such examinations within reasonable bounds. *When it is manifest that the design or effect of the questions is not to elicit facts, but to cast suspicion upon the character and*

*credibility of the witness, courts must intervene, or trials will result in a miscarriage of justice."* (Emphasis supplied.)

A review of the record convinces us that the sole purpose of the prosecutor's line of cross-examination was to characterize defendant as a fractious and intractable prison inmate. His success in this respect deprived defendant of a fair trial.

We agree with the Court of Appeals that prejudicial and reversible error was committed and would affirm their decision of reversal and remand for a new trial.

T. G. KAVANAGH, J., did not sit.