PEOPLE v. WRIGHT.

1. HOMICIDE—SELF-DEFENSE—EVIDENCE OF THREATS—COMMUNICATION TO DEFENDANT.

In prosecution for manslaughter by a constable who claimed self-defense, exclusion of evidence of threats made by deceased against defendant unless it was shown such threats were communicated to defendant *held*, prejudicial error, such evidence being admissible to show who was the aggressor in the affray.

2. CRIMINAL LAW—SELF-DEFENSE—PREJUDICIAL CROSS-EXAMINATION
—INNUENDO AS TO OTHER OFFENSES.

In prosecution of constable for manslaughter in which defendant
claimed self-defense, where it was shown deceased and another
were on defendant's premises about 3 o'clock in the morning
while it was yet quite dark, cross-examination of defendant
in which prosecuting attorney by inference or insinuation gave
the impression to the jury that defendant had made improper
use of his gun on other occasions *held,* prejudicial error (3
Comp. Laws 1929, § 17320).

3. HOMICIDE—OTHER OFFENSES—EVIDENCE.

Evidence of a difficulty or fight between deceased and defendant
which occurred some time before the homicide and is not con-
nected therewith, or of a previous difficulty between defendant
and a third person with which deceased had no connection,
and which was not a part of the transaction in which deceased
was killed, is inadmissible.

4. CRIMINAL LAW—MOTIVE, INTENT, SCHEME—CROSS-EXAMINATION—
INDEPENDENT ISSUES.

In prosecution of a crime which does not involve the element
of motive, intent, scheme or plan the cross-examination of
defendant should not ordinarily go so far as to permit the
introduction of evidence which has no legitimate relation to
any of the issues on trial and which is at the same time of
'such a character as to be likely to be applied to them by the
jury, and improperly to affect the verdict (3 Comp. Laws
1929, § 17320).

Appeal from Genesee; Gadola (Paul V.), J. Sub-
mitted April 11, 1940. (Docket No. 116, Calendar No.
40,690.) Decided June 3, 1940.

Eugene Wright was convicted of manslaughter.
Reversed, and new trial ordered.

*Ralph M. Freeman,* for appellant.

NORTH, J. Eugene Wright, a constable of Burton
township, Genesee county, was charged and convicted
by a jury of manslaughter incident to the homicide
of one Dona Groleau about 3 o'clock in the morning

of June 18, 1938. The affray happened on the home premises of defendant who admits that he shot Groleau but claims it was done in self-defense. A prison sentence was imposed and defendant has appealed.

During the evening of June 17, 1938, Wright and two companions, Charles Pitrosz and Stanley Curpits, had to some extent been drinking intoxicating liquor. Shortly before midnight they went to a place known as the Foundry Restaurant, where beer was purchased and consumed by the three. When the Wright party arrived there were other patrons in the place, among them Dona Groleau and his companion Wilfred Grothjan. Notwithstanding the various parties seemed to have had separate tables at which beer and lunches were being served, the individuals intermingled more or less. Pitrosz testified that Groleau and Grothjan invited him over to their table and one of them said to Pitrosz: "I like you, I like your friend over there (Curpits), that other son of a bitch (referring to defendant), I don't like him; I am going to get him." The record fairly indicates that this remark was prompted by the fact that one Harry Keenan—known as Shorty Keenan, and who was a friend of Groleau and Grothjan, was said to have had a talk with defendant, who was a constable of Burton township, about illegal traffic in marijuana cigarettes in the locality; and defendant reported this to the sheriff which resulted in some investigation and caused ill will towards defendant on the part of Dona Groleau. In connection with this phase of the case the defendant testified that Groleau and Grothjan also called him over to their table and one or the other of them said to defendant: "You are the one that squealed on Shorty Keenan;" whereupon, according to his testimony, defendant "turned around

and walked away. Nothing more unpleasant than that happened and that was all that was said.''

The beer garden where the parties had gathered closed about 2 a. m. and it was about this time that all of the parties mentioned were leaving. Defendant and his two companions went outside and got into Curpits' automobile. Just at that time, either Groleau or Grothjan came up to the car, opened the door, placed his hand on defendant's knee, and asked which one of those in the car was Gene Wright. Thereupon defendant said: ''You got your hand right on me,'' to which the man inquiring replied, ''Glad to meet you'' or some similar remark. Thereupon at the suggestion of one of the men in the car the door was closed and the three drove to defendant's home which required only 10 or 15 minutes. About the time they turned into the driveway of defendant's home it was observed that another car was behind them and it also turned into the driveway; but it backed out of the driveway and parked on the south side of the east and west street in front of a neighboring house and the headlights were turned out. Defendant got out of Curpits' automobile and went into defendant's house. Thereupon Curpits backed his car out of the drive and into the street, but as he and Pitrosz were passing the parked car they observed that it was occupied by the two men whom they had contacted at the Foundry Restaurant. Thereupon they drove back into defendant's driveway and Curpits went into the house and told defendant the other two men were sitting out in the parked car and cautioned him against having trouble with them. Then Curpits and Pitrosz started on their way again, but as they were about to pass the parked car one of the occupants stepped out into the road and caused Curpits to stop his automobile. The man

came up to the side of Curpits' car and said: "Where the hell is Gene Wright?" Curpits told the one inquiring that Wright was at home and going to bed. Some further quarrelsome remarks passed between the parties, after which Curpits and Pitrosz continued on their way.

The house next east was approximately 35 feet distant from defendant's house. Between the two houses was a joint driveway, the one into which Curpits had driven his car. There were no street lights in the vicinity and the night was rather dark. A short time after defendant had arrived at his home and while he was getting ready to retire he heard the sound of a car horn in his driveway and someone calling his name. He went to his front door and asked what the occupants of the car wanted. They requested him to come out but defendant refused to do so and told them to get out of his yard. It developed the occupants of the car were Groleau and Grothjan. There is testimony that these two men got out of their car, that they were cursing defendant and went towards the door of his screened porch. On several occasions defendant told the two men to go away, that he did not want any trouble with them. They insisted he should come outside and threatened to do him bodily harm. At the inception of this altercation defendant's wife and her two children by a former marriage were in the house. Either Groleau or Grothjan threatened to come and get defendant unless he came out into the yard. Defendant testified that he was in fear both for himself and his wife and the children. He thereupon stepped back into the house and got his shotgun which was loaded with rock salt, it having been so loaded because defendant had anticipated return of parties who had stolen gasoline out of his automobile. After defendant obtained the shotgun he again told the men to go away. Defendant

claims that at that time the two were out of their automobile and coming towards his porch. He thereupon fired the gun at the men, and evidently struck one of them who shortly complained that his face smarted. At some time during the altercation which lasted from 15 minutes to a half hour, the men in defendant's yard called him a "squealer." They remained on the premises and continued threatening defendant after defendant had fired the shotgun and after defendant had said to them: "You see that? You know what that means. Now you better get out of here." Defendant's wife also appeared on the scene and urged the two men to leave, saying that her husband did not want any trouble with them. After firing the shotgun, defendant stepped back into his house and got his revolver. He then returned to the porch and warned the men to go away. According to defendant's testimony the men at that time had approached and were standing within about five feet of the porch. They in turn continued their threats saying that if he did not come out they would come in and get him. The noise incident to the altercation was so great that it aroused neighbors for some considerable distance on either side of defendant's house. Finally defendant stepped off of his porch into the front yard. There is testimony that at that time one of the men rushed at him, and an encounter occurred in which defendant struck his assailant, probably with the revolver, and knocked him insensible. Just at this time deceased attacked defendant from the opposite direction and in the affray the shot was fired which resulted in his death. The bullet from Wright's gun penetrated Groleau's upper lip and lodged between the second and third cervical vertebrae. It severed the spinal cord and caused instant death. The body was found lying between Groleau's automobile which stood in the driveway and defendant's

porch. The automobile itself was standing comparatively close to the northeast corner of the porch on the front of defendant's house.

Numerous assignments of error are urged. Among them is the contention that the trial judge committed error in holding that threats made by the deceased against defendant were not admissible unless it was shown such threats were communicated to defendant. Defendant produced two witnesses by whom he sought to show the deceased had made statements at the Foundry Restaurant on the night in question which were in the nature of threats against defendant. Testimony of this character was of great importance in view of defendant's claim that the deceased and his companion were the aggressors in this affray, that they threatened him bodily harm at the time, and that the shooting was in self-defense. Further, it connected and emphasized the marijuana incident, as well as the circumstance of deceased or his companion at the time and place of the affray calling defendant a "squealer," threatening to get him, et cetera. Notwithstanding defendant's counsel repeatedly urged the importance of fully disclosing threats made against defendant by the deceased or his companions, the court repeatedly ruled that such threats were not admissible except they had been communicated to the defendant. This, we think under the circumstances of this case, was prejudicial error. It seems too plain for argument that had Groleau or his companion said to someone at the time they were leaving the Foundry Restaurant that they were going to follow defendant to his home and kill him, testimony of such a threat would have a bearing upon defendant's theory of self-defense and would have been admissible, notwithstanding the threat was not known to defendant.

See *People* v. *Cook,* 39 Mich. 236 (33 Am. Rep. 380); and 30 C. J. p. 241. In *People* v. *Cellura,* 288 Mich. 54, 64, the Court said:

"It is further claimed that the court erred in excluding from evidence threats of deceased and his companions which were not communicated to defendant. It is contended that threats, even though uncommunicated, are properly admissible as bearing on who the aggressor was; and such is the rule."

Appellant also urges, and we think properly so, that the trial court permitted the prosecuting attorney to indulge in a cross-examination of defendant that was improper and prejudicial. The character of this cross-examination is indicated by the following:

"*Q.* This isn't the first time you have had a few drinks and got to flashing a gun around either, is it?"

Over objection the court ruled the question competent; and the prosecuting attorney continued the examination as follows:

"*Q.* Is it?
"*A.* Well, I have been—
"*Q.* You what?
"*A.* I carried a gun quite a long time.
"*Q.* You have been pretty reckless with it quite a number of times, haven't you?
(An objection was overruled but no answer made.)
"*Q.* Did you ever have your revolver taken away from you?
"(Objection overruled) * * *
"*A.* Yes; when a fellow hit me in the— * * * Hit me in the face with a plate. I was sitting down at a table, I was not bothering anybody, with my wife, drinking coca-cola.
"*Q.* You had your gun on you, you got out there, after you had been drinking, waved it around the crowd, didn't you?
"*A.* No, sir.

"*Q.* You know Paul Smith, from the city police?
"*A.* Yes.
"*Q.* He took a gun away from you, didn't he?
"*A.* Yes, sir.
"*Q.* Because he did not think you were in a fit condition to be handling it?
(Objection overruled, but no answer)
"*Q.* Any other time you had had your gun taken away from you?
"*A.* No.
"*Q.* Didn't you lose your gun to a colored man down here one night?
"*A.* No, sir.
"*Q.* What happened that night?
"*A.* I gave it to the officers. * * *
"*Q.* When they came out there to get you out of a fight?
"*A.* It was in my car, the gun was.
"*Q.* You had gotten into a fight down there.
" *(Defendant's counsel)* : Just a moment, I object to all of this line of questioning as highly prejudicial, raising collateral issues; it has nothing to do with this case.
"*The Court:* It is perfectly competent with this man's defense, an inquiry into his entire attitude, himself."

We forego detailing other instances of like character where the prosecuting attorney by inference or insinuation gave the impression to the jury that defendant had made improper use of his gun on other occasions; one of these had to do with defendant's attempt, when acting as a constable, to arrest a man for a parking violation and the latter resisted the arrest; in this connection defendant testified: "I had a gun in my hand, but I never pulled it on him."

Permitting the foregoing cross-examination of defendant and embodying therein various insinuations of which there is no proof was not only improper but decidedly prejudicial to defendant. It was not only

his theory that throughout this affray the deceased and his companion were the aggressors, but the undisputed testimony is that these two men were on the premises where plaintiff lived, that they there started the altercation with defendant; and the testimony of witnesses who heard and those who heard and saw more or less of the altercation is all to the effect that defendant neither provoked nor perpetrated the quarrel with the deceased or his companion. Even his going off from his front porch and a few steps into his yard is explained by defendant's testimony that he feared the men otherwise might come into his house to get him and there do harm to his wife or the children. Under the setting of this case we think there was no justification for the prosecuting attorney cross-examining defendant at length in the manner indicated, and the result must be held to have denied defendant of his right to a fair and impartial trial.

"It was entirely inadmissible, in answer to general good reputation of the prisoner, to receive evidence of an alleged act of violence against another person than Bailey, at a former time and different place. The prisoner could not be prepared to meet any such testimony or explain it, and its introduction might seriously prejudice the jury." *Brownell* v. *People*, 38 Mich. 732, 736.

"Evidence of a difficulty or fight between deceased and defendant which occurred some time before the homicide and is not connected therewith, or of a previous difficulty between defendant and a third person with which deceased had no connection, and which was not a part of the transaction in which deceased was killed, * * * is inadmissible." 30 C. J. p. 197.

"In a criminal case, we do not think it competent to compel respondent, who is a witness, to answer questions irrelevant to the issue, having a tendency

to bring in other charges. Whatever latitude is proper in cross-examination to test veracity, it cannot properly introduce independent issues against the person who is both witness and respondent." *People* v. *Pinkerton,* 79 Mich. 110, 114.

"The latitude allowed in cross-examination should not ordinarily go so far as to permit the introduction of evidence which has no legitimate relation to any of the issues on trial, and which is at the same time of such a character as to be likely to be applied to them by the jury, and improperly to affect the verdict." *People* v. *McArron,* 121 Mich. 1, 36.

See, also, *People* v. *Dowell,* 136 Mich. 306, and *People* v. *Rohl,* 166 Mich. 315. In the prosecution of a crime which does not involve the element of motive, intent, scheme or plan (see 3 Comp. Laws 1929, § 17320 [Stat. Ann. § 28.1050]) cross-examination should be kept within the bounds above indicated.

Other errors are relied upon by appellant, but we think they may be passed without detailed discussion for the reason that some of these irregularities in the conduct of the trial were not of sufficient gravity to constitute reversible error, and as to others they were of such a character that there is little probability of their reoccurrence on retrial of the case.

For the reasons hereinbefore indicated, defendant's conviction is vacated and a new trial ordered.

BUSHNELL, C. J., and SHARPE, POTTER, CHANDLER, McALLISTER, WIEST, and BUTZEL, JJ., concurred.