*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DE AUNDRAY CARTESS SHAW,

Defendant-Appellant.

UNPUBLISHED
July 25, 2025
8:48 AM

No. 366176
Kalamazoo Circuit Court
LC No. 2021-001346-FC

Before: GARRETT, P.J., and RICK and MARIANI, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial convictions of first-degree premeditated murder, MCL 750.316(1)(a);[1] felon in possession of a firearm (felon-in-possession), MCL 750.224f; felon in possession of ammunition, MCL 750.224f(6); carrying a concealed weapon (CCW), MCL 750.227; and two counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced as a fourth-offense habitual offender, MCL 769.12, to serve concurrent terms of life imprisonment for first-degree murder, 6 to 30 years' imprisonment for felon-in-possession, 6 to 30 years' imprisonment for felon in possession of ammunition, and 6 to 30 years' imprisonment for CCW, all to be served consecutively to a term of two years' imprisonment for each count of felony-firearm. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On the afternoon of August 10, 2021, defendant fatally shot the victim. Earlier that day, defendant and the victim crossed paths while driving. The victim's ex-girlfriend, who was also the mother of defendant's son, testified that the victim sent her a photo of the back of defendant's car in the road, immediately followed by messages stating, " 'I wish I had a [gun],' " and " 'I'd kill him right now.' " The victim then called his ex-girlfriend. According to the victim's ex-girlfriend, the victim sounded "concerned and scared" during their call, so she instructed the victim to drive to a public area or to her house for safety. The victim ultimately drove to a friend's duplex

---

[1] Defendant was charged with open murder and ultimately convicted of first-degree murder.

because it was very near to where he was driving at that time. The victim's ex-girlfriend testified that she and the victim "were just talking about what happened" when the victim suddenly "sounded terrified" and exclaimed "this n***a finna shoot me," which, based on the photo that the victim had sent to her, she took to mean "that [defendant] was about to shoot him." Then, while the victim was "in the middle of a sentence," the victim's ex-girlfriend heard the victim scream, followed by several gunshots. The victim's ex-girlfriend repeated the victim's name several times, but when she did not receive a response, she "hung up and . . . called the police."[2]

Several individuals living or working in the area that day, including the victim's friend who lived at the duplex, all testified that they heard several rapid-fire gunshots in the early afternoon. Two neighbors who lived a few houses down from the duplex testified that moments before the shooting, they saw defendant park his car[3] in the driveway of one of the neighbors. One of the neighbors testified that, shortly thereafter, he saw defendant, holding something wrapped in a cloth, get out of his car and walk toward the duplex. Approximately 15 seconds after the gunshots, the two neighbors saw defendant run back to his car, jump inside, and speed off. Several individuals working on the roof of a nearby apartment building testified that they saw defendant point a gun at the driver's side window of the victim's car, repeatedly fire into the car, and then run away. The victim's friend testified that she stepped outside shortly after hearing the gunshots and, upon doing so, discovered the victim unresponsive in his car, which had been "backed . . . into the side of [her] duplex."

Video footage of the shooting, which had been captured by security cameras installed on the duplex, was also played for the jury. The video showed the victim in his car, which he had parked in a shaded area next to the detached garage of the duplex. Approximately 40 seconds later, defendant ran down the driveway toward the back of the victim's car with a gun at his side in his right hand. Defendant then ran toward the driver's side of the victim's car and, as the victim put his car in reverse, pointed the gun at the driver's side of the victim's car. As the victim started to reverse out of the driveway, defendant pressed himself against the front edge of the garage out of the path of the victim's car, got within a few feet of the driver's side door, and began shooting at the victim. Defendant fired the first shot at the driver's side door of the victim's car while standing between the front corner of the detached garage and the driver's side of the victim's trunk. Defendant fired five more shots at the victim in rapid succession to the first, all while chasing the victim's car after it had reversed past him. The victim reversed his car beyond the camera's view— with defendant following on foot—and the car could be heard crashing into the duplex immediately thereafter. Following the crash, defendant could be heard firing a shot, briefly pausing, then firing four more rapid-fire shots. Within a period of 12 seconds, defendant fired a total of 11 shots at the victim.

---

[2] After the victim's ex-girlfriend identified and verified the accuracy of the call logs and the victim's messages to her on the day of the shooting, they were provided to the jury as evidence.

[3] Photos taken by city cameras programmed to identify license plates later confirmed that defendant's car was parked in the neighbor's driveway at that time.

Defendant was apprehended and arrested within a few hours of the shooting. According to the testimony of several officers involved in defendant's arrest and the ensuing investigation, a box of ammunition with 12 missing bullets was found in the center console of one of defendant's cars,[4] which matched the brand and caliber of ammunition used to shoot the victim. Defendant was also interviewed by detectives twice following his arrest—once shortly after his arrest and again the following day. Although defendant initially denied involvement in the shooting, he subsequently admitted to shooting the victim and disposing of the gun immediately thereafter.[5] Police officers subsequently recovered the gun wrapped in a black cloth where defendant had described.

Defendant testified on his own behalf, focusing on the core theory of his defense: that he killed the victim in self-defense. Defendant admitted to shooting the victim as depicted by the security video, but he maintained that he only did so because the victim had threatened him and he was therefore afraid for his own life. Defendant explained that when he and the victim crossed paths on the road earlier that day, the victim had threatened to kill him and attempted to run him off the road. Defendant stated that he was "very scared and terrified" during this encounter because his "car had got shot at" twice during the week prior[6] and he believed that, based on the victim's threatening statements, the victim was the perpetrator and "was going to start shooting at [his] car again." Defendant called 911 to report the incident,[7] but he eventually ended the call because he and the victim had separated at a roundabout and so he no longer needed assistance.

Defendant testified that, shortly thereafter, the victim had gotten behind his car again, which made him "very scared." Defendant stated that, in response, he pulled into a nearby driveway, but when he did so, the victim also quickly pulled into a driveway a few houses down. Defendant then grabbed his gun wrapped in a scarf,[8] got out of his car, and walked up the driveway

---

[4] Defendant owned two cars—a gold Chrysler 300 and a gold Yukon—both of which were searched following defendant's arrest. Defendant drove the Chrysler 300 on the day of the shooting, and the box of ammunition was found in his gold Yukon.

[5] Edited versions of defendant's recorded police interviews were provided to the jury as evidence.

[6] Additional testimony from the police officers who investigated these prior shootings was offered by the defense. The officers testified that they were unable to determine whether the damage on defendant's car was caused by bullets. One of the officers also testified that defendant reported to her that he suspected another man whom he had previously encountered (as opposed to the victim) had shot at his car because the man was "trying to seek revenge." The detectives who interviewed defendant following the victim's death testified that defendant reported the same when discussing the prior shootings.

[7] An audio recording of defendant's 911 call was provided to the jury as evidence.

[8] Defendant also offered testimony regarding how he had come to have a gun with him in the car at the time of the shooting. According to defendant, he had purchased and concealed the gun in his car the evening before the shooting because of the two prior shootings and because he "was blew off by the police" when he attempted to obtain a bulletproof vest to protect himself. Defendant admitted to knowing that he could not legally purchase or possess a gun or ammunition

where the victim had parked to determine if the victim was still "pursuing" him. Defendant testified that he did not drive away at the time that he saw the victim drive past him and park in a nearby driveway because he believed the victim would simply follow him again, and he did not call the police for assistance at that time because he "didn't feel like [he] had enough time" to do so. Defendant testified that after he determined that the victim was still inside of his car, he saw the victim "start to reach" for what he believed was a gun,[9] put the car in reverse, and start backing up, all while yelling threats to kill him. Defendant admitted to firing several rapid-fire shots at the victim as the victim backed up his car, pausing briefly, then firing several more rapid-fire shots at the victim, but he explained that he only did so because he did not feel as if he had any other options at that moment besides shooting the victim. Defendant testified that he only intended to defend himself when he shot at the victim, and he did not learn that the victim had died from the shooting until the end of his interview with the investigating detectives.

Defendant was convicted and sentenced as previously described. This appeal followed.

## II. ADMISSIBILITY OF TEXT MESSAGES

Defendant argues that the trial court abused its discretion by excluding as improper character evidence several of the victim's text messages to other individuals. We disagree.

Evidentiary challenges are reviewed for abuse of discretion. *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). "The decision to admit evidence is within the trial court's discretion and will not be disturbed unless that decision falls outside the range of principled outcomes. A decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *Id*. at 251-252 (quotation marks and citations omitted). "The trial court necessarily abuses its discretion when it makes an error of law." *People v Wisniewski*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 361978); slip op at 7. "[W]hether a rule or statute precludes admission of evidence is a preliminary question of law that this Court reviews de novo." *People v Propp*, 508 Mich 374, 383; 976 NW2d 1 (2021).

MRE 404 and MRE 405 govern the admissibility of character evidence. *People v Edwards*, 328 Mich App 29, 34; 935 NW2d 419 (2019). Although character evidence is generally inadmissible to prove that a person "act[ed] in conformity therewith on a particular occasion," a defendant charged with homicide may nonetheless admit evidence of the victim's aggressive character "[w]hen self-defense is an issue." MRE 404(a)(2).[10] This type of character evidence, however, may only be admitted in the form of reputation or opinion testimony rather than by

---

due to a prior felony conviction that precluded him from doing so, but he nonetheless purchased them "off the streets" from a friend because he "was scared for [his] life" and "felt [he] had no other choice."

[9] No gun was ever found at the crime scene, on the victim's person, or amongst the victim's personal belongings.

[10] Our Supreme Court revised the Michigan Rules of Evidence effective January 1, 2024. See 512 Mich lxiii (2023). We cite the version of the rules that were in effect at the time of defendant's trial.

specific instances of conduct, unless (1) character is an essential element of a charge, claim, or defense, or (2) the testimony regarding those specific instances is independently admissible for some other reason. MRE 405; *People v Harris*, 458 Mich 310, 316-319; 583 NW2d 680 (1998); *Edwards*, 328 Mich App at 36-37. Whether a defendant had a reasonable apprehension of harm—i.e., whether the defendant "had a reasonable belief that he had to use deadly force to prevent his own death or to prevent great bodily harm to himself"—at the time of the homicide is an essential element of his claim of self-defense, and it is "well-settled law that specific acts of aggression by the decedent," if known to the defendant at the time of the homicide, "are admissible to establish a defendant's reasonable apprehension of harm." *Edwards*, 328 Mich App at 35-38.

In this case, defendant sought to introduce as evidence copies of the victim's messages to both the victim's ex-girlfriend and an unknown individual. The victim's messages to his ex-girlfriend spanned 30 pages, dated as far back as February 2021, and occasionally appeared to reference defendant. As the prosecution summarized, the victim's messages to the unknown individual occurred in April 2021 and indicated the victim's apparent interest in obtaining "a throwaway gun" so he could "get a n-word gone." Defendant argued that all of the messages were necessary to establish his claim of self-defense because: (1) they tended to show the victim's state of mind leading up to the shooting, the victim's aggressive character and animosity toward defendant, and that the victim was the probable aggressor; and (2) they shed light on defendant's state of mind at the time of the homicide and showed that he honestly and reasonably believed that his use of deadly force was necessary to prevent the victim from severely injuring or killing him. The prosecution argued that all of the messages should be excluded because they occurred well before the shooting and had never been communicated to defendant, so he was completely unaware of the purported threats at the time of the shooting.

The trial court admitted the messages the victim had sent to his ex-girlfriend on the day of the shooting because they had occurred minutes before the shooting and were relevant to defendant's encounter with the victim on the road. The court, however, excluded the remaining messages as inadmissible character evidence under MRE 404(a)(2) and MRE 405 because they were too remote in time, the meaning of the messages was unclear, and there was no evidence that defendant was aware of the messages.

We see no abuse of discretion in this ruling. Defendant conceded that the messages would be inadmissible as reputation or opinion evidence because they were never communicated to him and he was therefore unaware of them, but he argued that they were nonetheless admissible as specific-acts character evidence because "specific acts do not necessarily have to be known to the defendant." Defendant's primary purpose in offering the messages, however, was to show that the victim was the aggressor in the incident, which was an inadmissible use of specific-acts evidence under MRE 405. See *Edwards*, 328 Mich App at 36, citing *Harris*, 458 Mich at 319. And, to the extent that defendant was attempting to use the messages to show that he had a reasonable apprehension of harm at the time of the shooting, it is difficult to see how they might be admissible for that purpose given that the purported threats contained in the messages were never communicated to defendant prior to the shooting. See *Harris*, 458 Mich at 317 ("The purpose of this evidence is to show the defendant's state of mind; therefore, it is obvious that the victim's character, as affecting the defendant's apprehensions, must have become known to him, otherwise it is irrelevant."). Cf. *Edwards*, 328 Mich App at 38 (recognizing that specific-acts evidence may be admissible under MRE 405(b) where the defendant was not directly involved in the specific act

offered as evidence, but was "personally aware" of it).[11] Accordingly, the trial court did not abuse its discretion by excluding the messages as inadmissible character evidence under MRE 404(a)(2) and MRE 405.

In arguing otherwise, defendant relies heavily on *People v Wright*, 294 Mich 20, 27; 292 NW 539 (1940), in which our Supreme Court indicated that statements by the victim threatening the defendant, even if uncommunicated to the defendant, may be used to prove that the victim was the aggressor. Defendant's argument, however, overlooks that *Wright* involved statements made near the time of the incident that clearly implicated the defendant. See *id*. at 26-30. The messages excluded here, by contrast, were—as the trial court duly recognized—remote in time from the shooting and devoid of any clear references to defendant. Meanwhile, the trial court admitted the messages that occurred on the day of the shooting, in which the victim sent a picture of the back of defendant's car and indicated that he wished he had a gun because he would " 'kill [defendant] right now' "—even though those messages were never communicated to defendant. This ruling comported with *Wright*, and for the reasons discussed, we see no abuse of discretion in it.[12]

## III. SUFFICIENCY OF THE EVIDENCE

Defendant argues that the prosecution failed to prove beyond a reasonable doubt that he did not act in self-defense when he shot the victim. We disagree.

"This Court reviews a challenge to the sufficiency of the evidence by examining the record evidence de novo in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Clark*, 330 Mich App 392, 436; 948 NW2d 604 (2019) (quotation marks and citation omitted). It is the trier of fact's role to determine "the weight of the evidence [and] the credibility of witnesses," and we will not interfere with that role. *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). "Circumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of a crime, and it does not matter that the

---

[11] On appeal, defendant posits that "the trial court's ruling was erroneous because the evidence showed that [he] *was* aware of at least one of [the victim's] prior acts of violence and threats, albeit in an indirect way"—namely, that someone had shot at his car previously, acts that defendant had initially attributed to someone else until, on the day of the shooting at issue, the victim (according to defendant) told him that he (the victim) had done it. Evidence about the prior shootings of defendant's car, however, was admitted at trial, as was defendant's testimony about the victim taking credit for it. And none of this evidence changes that defendant did not have awareness of the content of the excluded messages when he shot the victim, or explains how those messages might have been admissible to show that defendant had a reasonable apprehension of harm from the victim at that time.

[12] Furthermore, to the extent the court committed any error in its handling of this evidence, such error would be harmless in our view, given the ample evidence (including the admitted portion of the messages at issue) that defendant was able to offer in support of his defense, as well as the very compelling, and untainted, evidence that was offered of his guilt. See *People v Propp (On Remand)*, 340 Mich App 652, 661-662; 987 NW2d 888 (2022).

evidence gives rise to multiple inferences or that an inference gives rise to further inferences." *People v Walker*, 330 Mich App 378, 382; 948 NW2d 122 (2019) (quotation marks, citations, and alteration omitted).

An individual accused of homicide may, under certain conditions, present a claim of self-defense at trial. *People v Riddle*, 467 Mich 116, 126; 649 NW2d 30 (2002); MCL 780.971 *et seq*. To justify or excuse on this basis what would otherwise be an unlawful homicide, the defendant must present evidence that: (1) he or she honestly and reasonably believed that he or she was in imminent danger, (2) the danger feared was death or serious bodily harm, (3) the action taken appeared at the time to be immediately necessary, and (4) he or she was not the initial aggressor. *Riddle*, 467 Mich at 126-127. "[T]he touchstone of *any* claim of self-defense, as a justification for homicide, is *necessity*," *id*. at 127, and, "[i]n general, a defendant does not act in justifiable self-defense when he or she uses excessive force or when the defendant is the initial aggressor," *People v Guajardo*, 300 Mich App 26, 35; 832 NW2d 409 (2013). "[O]nce [a] defendant injects the issue of self-defense and satisfies the initial burden of producing some evidence from which a jury could conclude that the elements necessary to establish a prima facie defense of self-defense exist," "the prosecution bears the burden of disproving the common law defense of self-defense beyond a reasonable doubt." *People v Dupree*, 486 Mich 693, 709-710; 788 NW2d 399 (2010).

The prosecution presented sufficient evidence from which a rational jury could conclude beyond a reasonable doubt that defendant did not act in self-defense when he shot the victim. Although defendant testified that the victim had threatened him on the road, he also testified that the men had split up at the roundabout and that he ended his call with the 911 dispatcher at that time because he no longer needed assistance from the police. When defendant later saw the victim behind him again, defendant, rather than driving away, decided to park his car in a nearby driveway, grab his gun, and approach the victim's car to determine if the victim was still "pursuing" him. A video of the shooting was played for the jury, which depicted defendant running at the victim's car with a gun and then rapidly shooting 11 bullets at the victim as the victim attempted to quickly reverse out of the driveway. Defendant testified that he began shooting at the victim because he saw the victim reaching for what he believed was a gun, but no gun was found in the victim's car or on his person. And the victim's ex-girlfriend testified that during her phone call with the victim immediately before and during the shooting, the victim "sounded terrified," and she heard the victim say "this n***a finna shoot me."

Defendant stresses the version of these events that he offered to the jury, but the jury clearly did not find that version credible, and we see no basis to second-guess or disrupt that assessment here. See *Kanaan*, 278 Mich App at 619. When viewing the evidence in a light most favorable to the prosecution, a reasonable jury could have readily concluded that, when he shot and killed the victim, defendant did not honestly and reasonably believe that he was in imminent danger of death or serious bodily harm such that shooting the victim was immediately necessary. See *Riddle*, 467 Mich at 126-127; *Walker*, 330 Mich App at 382; see also *Clark*, 330 Mich App at 436. The evidence was more than sufficient to disprove defendant's self-defense claim beyond a reasonable doubt, and we see no merit in defendant's arguments otherwise. See *Dupree*, 486 Mich at 709-710.

## IV. INSTRUCTIONAL ERRORS

-7-

Defendant argues that the trial court committed several instructional errors, including failing to instruct the jury on voluntary manslaughter as a lesser included offense of murder, on self-defense for the firearm-related offenses, or on duress for the CCW offense. We disagree.

"A defendant in a criminal trial is entitled to have a properly instructed jury consider the evidence against him or her." *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007). A trial court must "give instructions on any theory or defense supported by the evidence upon request." *People v Ogilvie*, 341 Mich App 28, 35; 989 NW2d 250 (2022). Such an instruction is warranted "if a rational view of the evidence supports [it]." *People v Armstrong*, 305 Mich App 230, 240; 851 NW2d 856 (2014). Jury instructions must be considered in their entirety "to determine whether the court omitted an element of the offense, misinformed the jury on the law, or otherwise presented erroneous instructions." *People v Hartuniewicz*, 294 Mich App 237, 242; 816 NW2d 442 (2011). "We review a claim of instructional error involving a question of law de novo, but we review the trial court's determination that a jury instruction applies to the facts of the case for an abuse of discretion." *People v Everett*, 318 Mich App 511, 528; 899 NW2d 94 (2017) (quotation marks and citation omitted).

## A. VOLUNTARY-MANSLAUGHTER INSTRUCTION

First, we see no error in the trial court's decision not to instruct to the jury on voluntary manslaughter. "Both murder and voluntary manslaughter require a death, caused by defendant, with either an intent to kill, an intent to commit great bodily harm, or an intent to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result." *People v Yeager*, 511 Mich 478, 489; 999 NW2d 490 (2023) (quotation marks and citation omitted). Murder, however, "possess[es] the single additional element of malice." *People v Reese*, 491 Mich 127, 144; 815 NW2d 85 (2012) (quotation marks and citation omitted). This malice element is negated, and the crime is therefore voluntary manslaughter, when the defendant "kill[s] in the heat of passion . . . caused by adequate provocation" with no "lapse of time during which a reasonable person could control their passions." *Yeager*, 511 Mich at 489-490.

In this case, the trial court found that a rational view of the evidence did not support a voluntary-manslaughter instruction because it was unreasonable to conclude that defendant "was acting out of passion or anger given the response time and the delay" and given that defendant "had time to calm down, leave the area, [and] not approach" the victim. We see no error in this determination. Defendant argues that the victim's conduct on the road prior to the shooting constituted adequate provocation, but that record plainly belies that claim. Testimony established that defendant and the victim first crossed paths on the road, but their encounter happened several minutes before the shooting, and the two separated from one another at a roundabout. Defendant testified that he encountered the victim a second time on the road a few minutes later, so he parked in a nearby driveway and watched as the victim pulled into a driveway a few houses down. Rather than drive away or call the police at that time—both of which defendant acknowledged he had considered as options—defendant instead chose to get out of his car and reengage with the victim by approaching the victim's car. Defendant also opted to bring along with him a loaded gun wrapped in a scarf—a gun that he had purchased and concealed in his car the night prior—when he walked up the driveway to approach the victim.

The testimony of the victim's ex-girlfriend regarding her phone call and messages with the victim indicated that at least a few minutes had passed from the time that he first encountered defendant on the road, and the video of the shooting reflected that at least 40 seconds had passed from the time that the victim had parked his car in the driveway and defendant ran up the driveway toward him. The video also reflected that defendant repeatedly shot at the victim as the victim was attempting to quickly reverse out of the driveway as defendant approached him with a gun, and that defendant fired six shots at the victim, paused briefly, then fired five more shots at the victim until his gun was empty.[13]

Under "a rational view of the evidence" presented in this case, a reasonable jury could not find that defendant killed the victim "in the heat of passion . . . caused by adequate provocation" with no "lapse of time during which a reasonable person could control their passions." *Yeager*, 511 Mich at 489-490 (quotation marks and citation omitted). The trial court did not abuse its discretion by determining that a voluntary-manslaughter instruction was inapplicable to the facts of this case and therefore did not err by refusing to instruct the jury accordingly. See *Everett*, 318 Mich App at 528.

## B. SELF-DEFENSE INSTRUCTION ON FIREARM-RELATED OFFENSES

We also see no error in the trial court's decision to instruct the jury on self-defense only as to the murder charge against defendant, and not the firearm-related charges. Before a trial court has an obligation to instruct the jury on self-defense, the defendant must produce some evidence on all the elements of self-defense—i.e., that he or she honestly and reasonably believed that he or she was in imminent danger of death or serious bodily harm, and that the use of force was necessary to avoid such harm. *Guajardo*, 300 Mich App at 35; see also *Riddle*, 467 Mich at 126-127. Michigan recognizes self-defense as a justification for nonassaultive crimes, including felon-in-possession, CCW, and felony-firearm. *People v Leffew*, 508 Mich 625, 639-640; 975 NW2d 896 (2022). And, as stated previously, "the touchstone of *any* claim of self-defense . . . is *necessity*." *Riddle*, 467 Mich at 127.

According to defendant, he was entitled to an instruction on self-defense for his firearm-related charges because he procured the gun and ammunition at issue in response to prior shootings at his car. The trial court found that a rational view of the evidence did not support such an instruction because it was not "reasonable to claim self-defense" "given . . . the timing of the prior shootings" and the fact that defendant purchased the gun and ammunition and concealed it in his car the evening before he encountered the victim. We see no error in this determination.

Defendant testified that his car had been shot at twice within the week leading up to the incident in question. Defendant admitted that, the evening after the second shooting, he illegally

---

[13] Defendant testified that the victim was yelling threats at him and reaching for a gun at this time, but he makes no argument on appeal that such conduct gave rise to adequate provocation; furthermore, that testimony was clearly at odds with all of the other evidence of the encounter, including its video recording, making it difficult to see how a "rational view" of the evidence would support an instruction on its basis.

purchased the gun and ammunition and then wrapped the loaded gun in a scarf and concealed it in his car. It then remained there until defendant used it to shoot the victim the following day. By defendant's own testimony, he procured the gun and ammunition and hid the gun in his car well before he was threatened by the victim on the road or had come to believe that the victim had perpetrated the past shootings. Indeed, defendant had never met the victim prior to their first encounter on the road and, both when he made his police reports regarding the prior shootings and also when he was interviewed by detectives following the victim's death, defendant surmised that someone else committed the shootings to get "revenge." Nor was there evidence to indicate that defendant had reason to expect another shooting at any particular time, let alone imminently. Although such facts indicate that defendant may have had a generalized fear of being shot at again by someone at some point, they do not suggest that defendant reasonably believed that he was in *imminent* danger of serious bodily harm or death such that committing the firearm-related offenses at that time was *necessary* to avoid such harm. See *Riddle*, 467 Mich at 126-127. Given the evidence presented at trial regarding these offenses, the trial court did not err by determining that a self-defense instruction on them was unwarranted. See *Everett*, 318 Mich App at 528.

C. DURESS INSTRUCTION ON CCW OFFENSE

For many of the same reasons, the trial court did not err by declining to provide a duress instruction on the CCW offense. "Duress is a common-law affirmative defense" that "does not negate any offense element but, rather, excuses the offense." *People v Gafken*, 510 Mich 503, 511; 990 NW2d 826 (2022) (quotation marks and citation omitted). To warrant a duress instruction, a defendant must provide sufficient evidence from which a jury could conclude that: (1) "[t]he threatening conduct was sufficient to create in the mind of a reasonable person the fear of death or serious bodily harm;" (2) "[t]he conduct in fact caused such fear of death or serious bodily harm in the mind of the defendant;" (3) "[t]he fear or duress was operating upon the mind of the defendant at the time of the alleged act;" and (4) "[t]he defendant committed the act to avoid the threatened harm." *People v Reichard*, 505 Mich 81, 88; 949 NW2d 64 (2020) (quotation marks and citation omitted). Evidence of "[a] threat of future injury is not sufficient; rather, the threatening conduct or act of compulsion must be present, imminent, and impending." *People v Henderson*, 306 Mich App 1, 5; 854 NW2d 234 (2014), overruled in part on other grounds by *Reichard*, 505 Mich 81 (quotation marks, citations, and ellipsis omitted). Additionally, "the threat must have arisen without the negligence or fault of the person who insists upon it as a defense." *Henderson*, 306 Mich App at 5 (quotation marks and citation omitted).

As with the self-defense instruction for the firearm-related offenses, defendant argued for a duress instruction on the CCW charge based on the prior shootings that prompted him to buy and hide the gun in question. The trial court rejected this argument for similar reasons as the self-defense instruction, and here too we see no error in that determination. As discussed, there was evidence to indicate that defendant had a general fear of being shot at in the future and therefore felt the need to carry a concealed firearm in his car; evidence of a generalized threat of future harm, however, is insufficient warrant a duress instruction. See *id*. Defendant emphasizes on appeal that the prior shootings were "uppermost in his mind" during his encounter with the victim and only added to his fear, but defendant fails to explain how that might demonstrate he was under duress at the time he chose to carry a concealed weapon, which occurred well before he had ever

encountered the victim.[14]  Based on the evidence presented, there is nothing to suggest that the threat perceived by defendant was "present, imminent, and impending" at the time he committed the offense, such that a duress instruction would have been warranted.  *Id.* (quotation marks and citations omitted).  The trial court thus did not err by declining to provide that instruction to the jury.  See *Everett*, 318 Mich App at 528.

## V.  RIGHT TO PRESENT A DEFENSE

Defendant argues that the trial court's exclusion of the victim's messages and refusal to provide the aforementioned requested instructions deprived him of his due-process right to present a defense.  We disagree.

"Whether a defendant was deprived of his constitutional right to present a defense is reviewed de novo."  *People v Bosca*, 310 Mich App 1, 47; 871 NW2d 307 (2015), rev'd in part on other grounds 509 Mich 851 (2022).  Although "[a] criminal defendant has a state and federal constitutional right to present a defense," that "right is not absolute," and a defendant must still "comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."  *People v Daniels*, 311 Mich App 257, 265; 874 NW2d 732 (2015) (quotation marks and citation omitted).  As previously discussed, the trial court did not err by excluding some of the victim's messages because defendant's attempt to use those messages did not comply with the Michigan Rules of Evidence.  See *id.*  Nor did the trial court err by failing to give the requested jury instructions because defendant had not presented sufficient evidence to support them—something defendant was procedurally required to do before receiving such instructions.  See *id.*; see also *Ogilvie*, 341 Mich App at 35.

Furthermore, despite the trial court's exclusion of the challenged messages and refusal to provide the requested instructions, the record makes clear that defendant was able to present a meaningful defense.  Defendant presented several witnesses, provided many pieces of physical and photographic evidence, and thoroughly cross-examined each of the prosecution's witnesses.  Defendant also testified on his own behalf, explaining that the victim had repeatedly threatened him and that he acted out of a fear of death or severe bodily harm.  Defendant also presented significant evidence in support of this testimony, including evidence regarding the prior shootings of his car, the police's refusal to provide him with a bulletproof vest, his 911 call during his first encounter with the victim, and the victim's messages to his ex-girlfriend shortly before the shooting, in which the victim indicated that he was behind defendant's car and wished he had a gun so that he could " 'kill [defendant] right now.' "  And defendant ably articulated his theory of the case based on this evidence to the jury during closing argument.  The record in this case does not support defendant's contention that he was denied his constitutional right to present a defense.  Accordingly, defendant is not entitled to relief on this issue.

---

[14] Furthermore, even if defendant had not already completed the offense of CCW by the time he first encountered the victim, he, at minimum, significantly compromised his ability to invoke duress as a defense by later choosing to reengage with the victim in the driveway.  See *People v Lemons*, 454 Mich 234, 247 n 18; 562 NW2d 447 (1997).

-11-

## VI. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant also argues in his supplemental Standard 4 brief[15] that his trial counsel was ineffective for failing to file a motion to suppress his confession to the police and the physical evidence that was collected as a result (namely, the gun used in the shooting) because his confession was illegally obtained. Whether counsel was ineffective presents a mixed question of fact and law, with factual findings reviewed for clear error and questions of law reviewed de novo. *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018). "The trial court's findings are clearly erroneous if this Court is definitely and firmly convinced that the trial court made a mistake." *People v Shaw*, 315 Mich App 668, 672; 892 NW2d 15 (2016). Defendant failed to move for an evidentiary hearing or a new trial, so our review is limited to errors apparent from the record. See *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020).

"To establish ineffective assistance of counsel, a defendant must show (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *Shaw*, 315 Mich App at 672. This Court presumes counsel was effective, and defendant carries a heavy burden to overcome this presumption. *People v Muniz*, 343 Mich App 437, 448; 997 NW2d 325 (2022). This burden includes "overcom[ing] the strong presumption that counsel's performance was born from a sound trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). That said, "a court cannot insulate the review of counsel's performance by calling it trial strategy; counsel's strategy must be sound, and the decisions as to it objectively reasonable." *People v Ackley*, 497 Mich 381, 388-389; 870 NW2d 858 (2015) (quotation marks and citation omitted).

Defendant asserts that, during communications with defense counsel, he had thoroughly described the circumstances of his police interviews and provided what he deemed to be relevant portions of the transcript of the first interview—which he has also provided to this Court on appeal—but that counsel refused to move to suppress the confession because (as defendant put it) counsel did not "think the judge would go for it." Defendant argues that defense counsel's performance fell below an objective standard of reasonableness because, having reviewed a copy of the interview videos, the transcripts provided by defendant, and defendant's description of the interviews, counsel should have moved to suppress the confession and the resulting evidence rather than merely relying on her assumption that the trial judge "would not go for it."

By defendant's own admission, however, his trial counsel considered all of the evidence to be presented at trial, the recorded interviews, partial transcripts of the first interview, and defendant's description of the interviews and, based on that information, decided not to file a motion to suppress because doing so would likely be unsuccessful. And there is nothing in the record to suggest that his confession was illegally obtained, or that a motion to suppress would have been successful. Defense counsel may reasonably decline to object to procedures, evidence, or arguments as a matter of trial strategy, see *People v Unger*, 278 Mich App 210, 242, 253; 749 NW2d 272 (2008), and counsel is not ineffective for failing to advocate a futile or meritless

---

[15] Defendant filed a supplemental Standard 4 brief pursuant to Michigan Supreme Court Administrative Order No. 2004-6, 471 Mich c, cii (2004).

position, *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). Defendant has failed to show that counsel performed deficiently by choosing not to move to suppress defendant's confession or the gun. See *Ericksen*, 288 Mich App at 201; *Unger*, 278 Mich App at 242, 253. Furthermore, there was significant other evidence of defendant's guilt beyond his confession—namely, the testimony of several eyewitnesses, a video of defendant committing the shooting, and defendant's own testimony at trial. Given this evidence, defendant has not shown that, even if counsel performed deficiently by not seeking suppression of his confession, there was a reasonable probability that the result of the proceedings would have been different but for that failure. See *Shaw*, 315 Mich App at 672.

Affirmed.

/s/ Kristina Robinson Garrett
/s/ Michelle M. Rick
/s/ Philip P. Mariani

-13-